SCOTT A. EDELMAN, (SBN 116927)
  sedelman@gibsondunn.com
ILISSA SAMPLIN, (SBN 314018)
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Suite 4000
Los Angeles, CA  90067-3026
Telephone: 310.552.8500
Facsimile:  310.551.8741

GABRIELLE LEVIN (*pro hac vice*)
  glevin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone: 212.351.4000
Facsimile:  212.351.4035

Attorneys for APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SA MUSIC, LLC, et al., | CASE NO. 3:20-cv-02146-WHO |
| | CASE NO. 3:20-cv-02794-WHO |
| Plaintiffs, | CASE NO. 3:20-cv-02965-WHO |
| v. | **DEFENDANT APPLE INC.'S NOTICE OF MOTION AND *DAUBERT* MOTION TO EXCLUDE EXPERT REPORT OF TY ROBERTS** |
| APPLE INC., et al., | |
| Defendants. | **Hearing:** |
| | Date: January 26, 2022 |
| | Time: 2:00 p.m. |
| | Judge:   Hon. William H. Orrick |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

**PLEASE TAKE NOTICE** that on January 26, 2022 at 2:00 p.m. before the Honorable William H. Orrick, in Courtroom 2 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Defendant Apple Inc. will and hereby does move this Court to exclude the testimony of Plaintiffs' expert Ty Roberts in support of Plaintiffs' Motion for Partial Summary Judgment, on the grounds that his report and related opinions therein are inadmissible, irrelevant, and unreliable under Federal Rule of Evidence 702(a), as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), and related authorities.

This motion is based on this Notice and Motion, the accompanying Memorandum of Points and Authorities, all accompanying declarations and exhibits, other documents on file in this or related actions, oral argument of counsel, witness testimony, and any other matters of which the Court may take judicial notice.

Dated: December 22, 2021

GIBSON, DUNN & CRUTCHER LLP

By: /s/ *Scott A. Edelman*
      Scott A. Edelman

Attorneys for APPLE INC.

Gibson, Dunn & Crutcher LLP

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................. 1

II. BACKGROUND ............................................................................................................... 2

III. LEGAL STANDARD ....................................................................................................... 3

IV. ARGUMENT ................................................................................................................... 4

    A.    Roberts Has No Specialized Knowledge Regarding Audible Magic ........................... 4

    B.    Roberts's Testimony Is Unreliable Because He Assumed The Accuracy Of The System He Was Supposed To Validate ........................................................................... 6

    C.    Roberts Is Not Qualified To Opine On What Apple "Should Have Done" To Prevent Copyright Infringement ................................................................................... 8

V. CONCLUSION .................................................................................................................. 11

DEFENDANT APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE EXPERT REPORT OF TY ROBERTS

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Cooper v. Brown*,
510 F.3d 870 (9th Cir. 2007)..............................................................................................4

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993).................................................................................................3, 4, 6

*Johnson v. Hartford Casualty Ins. Co.*,
2017 WL 2224828 (N.D. Cal. May 22, 2017) .....................................................................4

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999).........................................................................................................3

*United States v. Hermanek*,
289 F.3d 1076 (9th Cir. 2002)......................................................................................6, 10

*United States v. Valencia-Lopez*,
971 F.3d 891 (9th Cir. 2020)...........................................................................3, 8, 10, 11

**RULES**

Fed. R. Evid. 702 .............................................................................................................4

DEFENDANT APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE EXPERT REPORT OF TY ROBERTS

## I. INTRODUCTION

Plaintiffs' expert Ty Roberts has had a long and distinguished career in music technology. But none of his experiences qualify him to offer the opinions he put forward in these cases.

Roberts authored a report titled "Audible Magic Content Identification and Analysis" that purports to describe and opine on the accuracy of a series of reports created by Audible Magic—a company that operates a system that compares sound recordings to recordings in its reference database using "audio fingerprinting" and a proprietary algorithm. But Roberts has never worked for Audible Magic and knows nothing about its algorithm. His knowledge about how Audible Magic works comes from secondhand sources or Audible Magic promotional materials, including a PowerPoint presentation Plaintiffs' attorneys found on the Internet. Roberts—who candidly testified that he is "not an expert" on how Audible Magic works—is not qualified to offer expert testimony about Audible Magic.

Nor is Roberts qualified to offer expert testimony about the specific reports Audible Magic created for this case. He was not involved in creating the reports, and his interpretation of them is based on a conversation with an Audible Magic employee whose name he could not remember. And when Roberts reviewed the Audible Magic reports he had been retained to validate, he did nothing to verify the accuracy of those reports. Instead, he "assume[d]" that "the fingerprinting was accurate" and that any discrepancies in the report were the result of users introducing mistakes into the reference database. Roberts admitted that he could have investigated apparent discrepancies by listening to the recordings at issue, but he did not do so because he "trust[ed] the accuracy of the fingerprinting."

Finally, Roberts is unqualified to testify about what Apple "should have" done to prevent alleged copyright infringement in the iTunes Store. Roberts does not know anything about Apple's current systems and processes for preventing copyright infringement, so he is in no position to critique them. Moreover, he does not know what systems are industry-standard for digital music retailers. Nor does he attempt to explain how his experience at Gracenote, a music database company, qualifies him to opine as to how digital music retailers like Apple should structure their businesses.

In short, Plaintiffs have proffered Roberts to vouch for the accuracy of the Audible Magic reports their lawyers commissioned and to advance their narrative about how Apple should have

designed the iTunes Store. But Roberts is manifestly unqualified to testify about Audible Magic or the iTunes Store, and his opinions about Audible Magic—which begin with the assumption that Audible Magic's reports simply must be accurate—are inherently unreliable. The Court should strike the Roberts report from the summary judgment record and preclude Roberts from testifying at trial.

## II. BACKGROUND

Apple operates the U.S. iTunes Store, a digital music store that currently offers over 40 million tracks for sale via permanent download. Plaintiffs are the purported partial owners of copyrights in musical compositions by Harold Arlen, Ray Henderson, and Harry Warren (the "Subject Compositions"). Plaintiffs allege Apple willfully infringed their copyrights by offering for sale in the iTunes Store 1,206 "pirated" sound recordings and promotional streams that allegedly embody the Subject Compositions. The Subject Compositions were supplied to Apple by digital distributors who are Apple's co-defendants in these cases: Adasam and Adasam Limited, the Pickwick defendants, and Genepool Distribution Limited (the "Content Providers").

On September 3, 2021, Plaintiffs served Apple's counsel with the expert report of Ty Roberts ("Roberts Report"), No. 20-cv-2146, Dkt. 115-1,[1] Ex. 1. Roberts is a self-described digital media "leader and innovator," and he co-founded Gracenote, an audio content recognition ("ACR") system, in 1998. Dkt. 115-1, Ex. 9 at 1–2. Roberts spent 17 years at Gracenote, then went to work at Universal Music Group. *Id.* at 2. After a year at Universal, he left the record label and became an independent consultant and advisor for a variety of music companies, including TIDAL. *Id.*

Roberts's report is titled "Audible Magic Content Identification Report and Analysis." Dkt. 115-1, Ex. 1. It purports to describe how Audible Magic, a different ACR system than Gracenote, works. *Id.* at 2–6. According to Roberts, ACR systems use "audio fingerprinting" to compare a given sound recording to recordings in a "reference database." *Id.* at 2–3. ACR systems "scan[] the reference database for matches and then return[] results." *Id.* at 3. Attached to Roberts's report are four reports generated by Audible Magic, three "Audible Magic Rights Rx" reports and one "Audible Magic Private Database" report. The "Audible Magic Rights Rx" reports purport to identify "matches" between

---

[1] Unless otherwise noted, all citations to docket entries are references to the docket in the *Adasam* case, No. 3:20-cv-02146-WHO.

Gibson, Dunn &
Crutcher LLP

sound recordings that were produced in these cases and sound recordings in Audible Magic's reference database. *Id.* at 7–8; Edelman Decl. Exs. 1–3. The "Audible Magic Private Database" report purports to identify "matches" between sound recordings that were produced in these cases and reference recordings supplied by Plaintiffs' counsel. Dkt. 115-1, Ex. 1 at 9; Edelman Decl. Ex. 4. Roberts's report describes the content of the various Audible Magic reports and concludes that the Rights Rx reports "are reliable and accurate analyses of matches resulting from the comparison between the recordings produced by Apple and the recordings in the Audible Magic database," and that the Private Database Report "is a reliable and accurate analysis of matches resulting from the comparison between Pirated Recordings and Original Release Recordings." Dkt. 115-1, Ex. 1 at 11.

Roberts also opines on "Apple's use of Gracenote," explaining that he downloaded an iTunes Store submission tool called "iTunes Producer" and assessed how that tool employs Gracenote technology. On the basis of that assessment, he opines on what kind of system Apple should put in place "to avoid infringement" in the iTunes Store. Dkt. 115-1, Ex. 1 at 10–12.

In their motion for partial summary judgment, Plaintiffs rely on the Roberts report to argue that "Adasam, Pickwick, and Genepool are copying major label recordings," that Apple could use Gracenote "to identify rights conflicts and notify competing providers," and that Apple's policies regarding the iTunes Store violate "common sense." Dkt. 111-1, Pls.' Mot. for Partial Summary Judgment ("Pls.' Mot.") at 30, 46–47, 50–51.

### III. LEGAL STANDARD

"Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all [expert] testimony'" is both relevant and reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). When considering such testimony, the court has a "special obligation," *see Kumho*, 526 U.S. at 147–48, to act as "gatekeeper" by assessing the soundness of the expert's methodology and excluding testimony that does not satisfy Rule 702 or *Daubert*. *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020); *see Daubert*, 509 U.S. at 589–90. This is true both when an expert's testimony is based on science and when it is based on the expert's experience. *Valencia-Lopez*, 971 F.3d at 898

Under Rule 702, expert testimony is admissible only when

Gibson, Dunn &
Crutcher LLP

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. For expert testimony to be sufficiently reliable, there must be "good grounds" for the testimony—it cannot be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. The proponent of expert evidence bears the burden of proving that the testimony satisfies Rule 702. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

## IV. ARGUMENT

### A.     Roberts Has No Specialized Knowledge Regarding Audible Magic

"For expert testimony to be 'relevant' under Federal Rule of Evidence 702, the expert must offer 'specialized knowledge' that will 'help the trier of fact to understand the evidence or to determine a fact in issue.'" *Johnson v. Hartford Casualty Ins. Co.*, 2017 WL 2224828, at *2 (N.D. Cal. May 22, 2017) (quoting Fed. R. Evid. 702).

Roberts has had a long career in the music industry, but he has no special expertise in Audible Magic that qualifies him to opine on how Audible Magic works or its reliability. Roberts has never worked for Audible Magic. Dkt. 111-18, Ex. 70 at 107:13–15. He worked for Gracenote, an Audible Magic competitor, for many years, and he testified that when he was at Gracenote, he was "aware of what [Audible Magic] did kind of at a high level." *Id.* at 105:24–106:1. Roberts's "high level" awareness of what Audible Magic does comes from Audible Magic's own efforts to promote itself. Roberts testified in his deposition that his information about Audible Magic comes from three sources: the Internet, public presentations by Audible Magic, and Gracenote's customers. *Id.* at 108:22–109:7.

One of Roberts's key sources of information for his report is a promotional PowerPoint presentation apparently created by Audible Magic and posted on the Internet. *Id.* at 29:6–13. Plaintiffs' counsel provided Roberts with the presentation. *Id.* at 29:6–13. The presentation seems to have been

presented to the European Union's Directorate-General for Communications Networks, Content and Technology (DG CNECT), but it is not clear from the document who drafted it, when they drafted it, why they drafted it, or exactly to whom they presented it. Edelman Decl. Ex. 5. The presentation appears in a PDF file with six other documents. *Id.* at 1. At his deposition, Roberts was unable to explain the circumstances under which the presentation was created or the other documents that appear in the PDF file. Dkt. 111-18, Ex. 70 at 27:24–29:1. Despite not knowing who created the presentation, whether its contents are accurate, and why the presentation was created, Roberts relied on the presentation when writing his report. *Id.* at 164:1–165:24. In fact, he copied multiple diagrams— including a depiction of how Audible Magic works—directly from the presentation into his report. *Id.* at 25:2–6, 103:10–24; Dkt. 115-1, Ex. 1 at 2 n.1, 3–4. He also relied on it when forming his belief that Audible Magic is "extremely reliable at identifying matches in its database," explaining that he believes Audible Magic is reliable because "it's in the presentation. They publish their false positives, false negatives. They talk about the accuracy of their system." Dkt. 111-18, Ex. 70 at 163:2–8. But Roberts himself has not done anything to verify the accuracy of Audible Magic's identification software, or to verify the figures Audible Magic published in its presentation. *Id.* at 164:1–165:24.

Any of Roberts's knowledge of Audible Magic that does not come from the PowerPoint Plaintiffs' counsel found on the Internet comes from a "corporate presentation" that Audible Magic made "at a trade show or at an audio engineering society meeting," and from what Gracenote's customers told Gracenote about Audible Magic. *Id.* at 29:14–24, 108:3–21. The presentation was "long ago," and Roberts does not "remember the details" of that presentation. *Id.* at 29:14–24. In other words, all of Roberts's information about Audible Magic's capabilities is either secondhand (from Gracenote's customers) or derived from public presentations (in which Audible Magic was promoting itself), the accuracy of which Roberts cannot vouch for.

Importantly, Roberts *admits* that he does not have any personal knowledge—specialized or otherwise—about how Audible Magic works or whether it is actually as reliable as it claims to be. Roberts testified at his deposition that he has "a general understanding as to what Audible Magic *claims to be able to do*," but he does not know "the details or specific of how they did it." *Id.* at 107:1–6 (emphasis added). He explained that after he was in the audience at an Audible Magic presentation,

Gibson, Dunn & Crutcher LLP

Gracenote "spent time trying to understand [Audible Magic's] database," but Gracenote was not "really interested in the actual – I'll call it recognition algorithm. We cared about the results, and we cared about the accuracy, but the actual mathematics of that, which is their own algorithm, was not something that I studied." *Id.* at 106:12–20. He added that the algorithm "was very proprietary, so we didn't try to find out more about that." *Id.* Or, as Roberts put it later in his deposition, "I am not an expert in Audible Magic's exact algorithm or its limitations." *Id.* at 263:21–22.

Given Roberts's lack of specialized information regarding how Audible Magic's algorithm works or its reliability, along with his own admission that he is "not an expert" in Audible Magic, Roberts is unqualified to offer expert testimony about the general functions or accuracy of Audible Magic. Such opinions should be struck from the summary judgment record and Roberts should be prohibited from offering them at trial.

## B. Roberts's Testimony Is Unreliable Because He Assumed The Accuracy Of The System He Was Supposed To Validate

Rule 702 "charges the court with assuring that expert testimony 'rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002) (quoting *Daubert*, 509 U.S. at 597). This requires the court to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (quoting *Daubert*, 509 U.S. at 592–93). Here, there is *no* reasoning or methodology underlying Roberts's testimony about the Audible Magic reports. He did not create them, did not participate in creating them, and did nothing to verify their accuracy. There is no foundation whatsoever for Roberts's opinions about the reliability of the reports, and his opinions therefore should be excluded as unreliable.

First, Roberts did not participate in any way in creating the Audible Magic reports attached to his expert report. He did not select the recordings that were provided to Audible Magic, did not provide the recordings himself, and did not give Audible Magic any instructions. Instead, Plaintiffs' counsel hired Audible Magic and provided Audible Magic with sound recordings and instructions about what types of reports to run. Dkt. 111-18, Ex. 70 at 168:7–20, 182:8–13. Someone at Audible Magic then created the requested reports, but Roberts does not know who that was or how the work was done. *Id.*

Gibson, Dunn & Crutcher LLP

at 195:8–22. Plaintiffs' counsel provided the completed reports to Roberts. *Id.* at 23:14–24:2. Plaintiffs' counsel then arranged a call between Roberts, someone from Audible Magic, and Plaintiffs' counsel so the Audible Magic employee could explain "the format of the data" and "what the results were from the reports" to Roberts. *Id.* at 15:19–16:22, 17:12–17, 19:18–22. During his deposition, Roberts referred to the Audible Magic employee (whose name Roberts could not recall) as "the Audible Magic expert." *Id.*

Roberts testified that his "job was to validate the fingerprinting" done by Audible Magic. *Id.* at 249:23–24. And Plaintiffs rely heavily on that fingerprinting in their motion for summary judgment, citing to Roberts's report for the (factually incorrect) assertion that Audible Magic "confirmed that Adasam, Pickwick, and Genepool are copying major label records." Pls.' Mot. at 30; *see* Apple's Opp. to Pls.' Mot., Part III.C.2.b. But in fact, Roberts made *no effort whatsoever* to actually validate Audible Magic's fingerprinting. The Audible Magic reports included multiple entries in which a single recording at issue in these cases was listed as a "match" for multiple different compositions. Roberts did not listen to the recordings to determine why there was a discrepancy; instead, he ***"assume[d] that the – that the fingerprinting was accurate,"*** and that any apparent mistakes were metadata errors. Dkt. 111-18, Ex. 70 at 242:5–7 (emphasis added).

For example, the Audible Magic reports identified the sound recording produced at APL-PICK_00000199 as a match for both "I've Got the World on a String" by Frank Sinatra and "Hey Now Listen" by the rapper JSapp. Edelman Decl. Ex. 1 at 14 ("FLAC Files" tab, lines 178–179). Roberts noticed this discrepancy, but he did not investigate to determine why two different compositions had been listed as a match for the same sound recording. Dkt. 111-18, Ex. 70 at 242:17–243:3. He testified at his deposition that "we could go and listen to those two tracks, and we can see what [the problem] is. But my *guess* would be that the fingerprinting—that there is an absolute match on the fingerprinting and the metadata is wrong." *Id.* at 240:10–14 (emphasis added). But he also testified that he did not go back and listen to the tracks. *Id.* at 240:18–20. And when pressed on why the recording had been identified both as "I've Got the World on a String" and "Hey Now Listen," he testified, "I am not going to be able to give the answer on that, except that the track length, the sample length is exactly double. We could research this further, but I would say *it's possible* that there are two

songs in one of the—in the longer one. There is actually two tracks in that one file. Anyways, that's a—I would need to listen to the audio and look at it, but it's very interesting this is twice as long." *Id.* at 240:21–241:10 (emphasis added). Roberts then admitted that he was "speculating as to what's possible" and that he had not listened to *any* sound recordings to assess apparent discrepancies in the Audible Magic reports. *Id.* at 241:11–13, 242:25–243:8.

There are multiple such discrepancies. For example:

- The sound recording produced at APL-PICK_00002428 was identified as a match for two copies of *Lucky In Love* by Sarah Vaughn and one copy of *My Ship* by Sarah Vaughn. Edelman Decl. Ex. 2 at 2 ("splr2_alac" tab, rows 18–20).

- The sound recording produced at APL-PICK_00002475 was identified as a match for multiple copies of *Alabamy Bound* by Fletcher Henderson, two copies of *Alabamy Bound* by Louis Armstrong, and one copy of *Farewell Blues* by Benny Goodman. *Id.* at 7 ("splr2-m4A" tab, rows 51–60).

- The sound recording produced at APL-PICK_00000231 was identified as a match for three copies of *Come Rain or Come Shine* by the Bill Evans Trio and one copy of *All Night Long* by Kenny Burrell and others. *Id.* at 10 ("splr2-slow" tab, rows 18–21).

Roberts conceded that to determine why such discrepancies exist, someone would have to "listen to" the sound recordings in question. Dkt. 111-18, Ex. 70 at 245:19. But he repeatedly testified that *he did not listen* to the sound recordings because he was "***trusting the accuracy of the fingerprint***, which is like one in 10 million." *Id.* at 245:19–246:3 (emphasis added). (Nowhere in Roberts's deposition testimony or report did he explain how he arrived at an accuracy rate for Audible Magic of "one in 10 million," or what that statement means in the first place.)

"The Supreme Court has made it abundantly clear that reliability is the lynchpin" of the court's role as a gatekeeper when it comes to expert evidence. *Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020). The conclusions of an expert who assumes the accuracy of the very system he has been tasked with validating are inherently unreliable. Thus, Roberts's opinions as to the accuracy and reliability of the Audible Magic reports must be excluded in their entirety.

## C.    Roberts Is Not Qualified To Opine On What Apple "Should Have Done" To Prevent Copyright Infringement

At the end of Roberts's report, he offers a brief assessment of how the iTunes Store uses Gracenote, the music database company Roberts co-founded, and opinions about what Apple "should

Gibson, Dunn & Crutcher LLP

have" and "could have" done to prevent copyright infringement in the iTunes Store. Dkt. 115-1, at 10–12. He concludes his report with the statement that "Apple's current system is wide open for piracy and leaves copyright owners having to find the infringing albums and tracks manually." *Id.* at 12.

Roberts is not qualified to testify about what Apple's systems are or what they "should" be. He cannot testify about what Apple's "current system" is because he already testified that he does not know anything about it. He does not know what information Apple stores in its databases. Dkt. 111-18, Ex. 70 at 268:11–14. He does not know what Apple requires of its content providers, whether they are major record labels, aggregators, or independent distributors. *Id.* at 276:10–14. When he was at Universal, he never reviewed Universal's contract with Apple. *Id.* at 120:7–12. He does not know what kind of background checks Apple does on distributors. *Id.* at 276:15–19. At his deposition he conceded that he does "not know what Apple does behind the scenes." *Id.* at 277:12–19.

Roberts is not qualified to testify about what Apple's systems "should" be because he has no basis for his conclusions other than his own personal opinion. Roberts is not an expert in preventing copyright infringement. He describes himself as an "ACR expert," Dkt. 115-1, Ex. 1 at 12, and he was retained by Plaintiffs' counsel as "an expert in the area of audio fingerprinting." Dkt. 111-18, Ex. 70 at 21:16–23. He has never worked directly on antipiracy or infringement prevention efforts related to digital music retailers—not at Universal, not at TIDAL, and not anywhere else. *Id.* at 98:14–18, 123:17–24. As a result, he does not know what, if any, infringement prevention mechanisms are industry-standard for digital retailers. He does not know whether Universal (or any other record label) requires digital retailers to use audio fingerprinting or—if they do—what types of systems they require. Roberts explicitly conceded during his deposition that he is "not the expert to know to what level [infringement prevention] tools were required from all the many different retailers that are out there." *Id.* at 114:2–5. He confirmed that he is "not in a position" to "testify as to how Audible Magic is primarily used in the industry." *Id.* at 174:12–16. And when asked if he could describe industry custom and practice "as to whether record labels require the use of ACR before a digital upload," he responded, "It's not the subject of my report. It's not something that I have a comment on." *Id.* at 135:19–136:2.

Roberts's report describes the process he thinks Apple "should have" implemented to prevent alleged copyright infringement in the iTunes Store, asserting that Apple could have "an automated

Gibson, Dunn &
Crutcher LLP

process that flags matching recordings and triggers an inquiry to the provider of the matching recording to validate its ownership," and that "[a]ny release that matches a recording in the reference database must be flagged for manual review." Dkt. 115-1, Ex. 1 at 11. Plaintiffs rely on that testimony to argue that Apple should have implemented such a process, and that its failure to do so is evidence of willful copyright infringement. Pls.' Mot. at 46–49. But Roberts testified at his deposition that he is "not saying it is an industry standard" for digital retailers to operate such systems, because he is "not aware of any industry standard practices." Dkt. 111-18, Ex. 70 at 273:14–20. He also does not know whether any major digital retailers in fact use the type of system he recommends. *Id.* at 273:21–25. Thus, his opinion about the system Apple *should* have in place rests entirely on his own personal opinion, which he conceded is not based on any industry custom or standard, but rather based merely on how Gracenote operated during his time there. *Id.* at 272:7–9 ("So you're saying personally this is what you think should happen? Yes. Right."); 205:6–7 ("[T]his is what I would have done at Gracenote."); 206:15–20 ("I can only talk about what I did at Gracenote."); 272:21–273:4 ("I'm just saying this is what I did at Gracenote."). Gracenote is a "metadata and media recognition provider," not a digital music retailer. Dkt. 115-1, Ex. 1 at 1. It is literally in the business of creating and maintaining a database of audio files and music-related information, and has been for decades. *See, e.g.*, Dkt. 111-18, Ex. 70 at 44:1–45:6, 59:5–6, 64:16–65:15, 67:5–8 (describing the origins of Gracenote). It cannot be the basis—and certainly not the *sole* basis—for an expert opinion about a digital retailer's copyright prevention mechanisms.

Roberts may be an expert on Gracenote's technology. But "general qualifications" do not allow an expert to testify on any issue tangentially related to his area of expertise. *Valencia-Lopez*, 971 F.3d at 900. The proponent of expert testimony has the burden of "establish[ing] the reliability of the principles and methods employed 'to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant.*'" *Id.* (quoting *Hermanek*, 289 F.3d at 1094) (emphasis in original). And where particular conclusions are based on an expert's experience, the expert must "link his general expertise with his . . . conclusion[s]." *Id.* Roberts did not do so here. Nowhere does Roberts articulate why his experience at Gracenote qualifies him to opine on what infringement-prevention systems Apple—a digital music retailer with a different product and a different position in

Gibson, Dunn & Crutcher LLP

the market than Gracenote—"should" have. "[T]here is simply too great an analytical gap between" Roberts's "experience and his conclusion," so his opinions regarding what systems Apple "should" have had in place must be excluded. *Id.* at 901 (quotation omitted).

## V. CONCLUSION

The Court should strike Roberts's report from the summary judgment record and preclude Roberts from testifying at trial.


Dated: December 22, 2021

GIBSON, DUNN & CRUTCHER LLP


By: /s/ *Scott A. Edelman*
　　　Scott A. Edelman

Attorneys for APPLE INC.

DEFENDANT APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE EXPERT REPORT OF TY ROBERTS

Gibson, Dunn &
Crutcher LLP