UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California

| | |
|---|---|
| SA MUSIC LLC, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>APPLE, INC, et al.,<br><br>        Defendants. | **ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND *DAUBERT* MOTIONS**<br><br>Case No. 3:20-cv-02146-WHO<br><br>Re: Dkt. Nos. 108, 109, 110, 111, 128, 132, 138, 143, 145<br><br>Case No. 3:20-cv-02794-WHO<br><br>Re: Dkt. Nos. 113. 114, 115, 116, 134, 138, 144, 149, 151<br><br>Case No. 3:20-cv-02965-WHO<br><br>Re: Dkt. Nos. 102, 103, 104, 105, 117, 121, 128, 133, 135 |

## INTRODUCTION

Defendant Apple, Inc. ("Apple") owns and operates the iTunes Store, an online digital music store with millions of recordings. The plaintiffs in these three related suits own (or claim to own) the rights to 101 musical compositions by eminent songwriters. They allege that serial copyright infringers—that is, "pirates"—uploaded recordings of those compositions to the iTunes Store without the right to do so. Those serial infringers' business model, the plaintiffs say, is to illicitly upload numerous recordings to digital stores and remove, or acquiesce to removal of, the compositions if there is an assertion of rights by another party. These motions, however, do not concern those alleged infringers' liability, they concern the scope of *Apple's* liability for hosting the allegedly infringing recordings on the iTunes Store.

Both parties move for summary judgment on whether Apple's infringement, if any, was willful—a finding that would entitle the plaintiffs to increased damages. Apple's motion on willfulness is granted and the plaintiffs' is denied. Apple has shown that it required, and

reasonably relied on, representations that users possessed valid rights to the recordings they uploaded.  And Apple has shown that it maintained a notice-and-takedown procedure for anyone wishing to challenge the rights to any recording on the iTunes Store (which these plaintiffs never did).  The plaintiffs primarily counter that it would have been obvious to Apple that the uploaders were serial infringers; they argue that a jury could find that Apple was willfully blind to this reality or acted recklessly in permitting them to use the iTunes Store.  But the record evidence shows that it was not sufficiently obvious, from Apple's perspective, that these particular uploaders were such serial infringers that Apple's alleged infringement was willful.

Apple also seeks summary judgment on whether it can be held liable for copyright infringement for "making available"—as opposed to actually selling—the compositions.  Although courts have divided on this issue, I conclude that the copyright laws support this theory of liability on the facts of this case.  Apple's motion is also denied on its argument that it did not infringe as a matter of law by placing "promotional clips" of the recordings on the iTunes Store.

For their part, the plaintiffs seek summary judgment that they own or control exclusive rights in the compositions at issue.  Their motion is largely granted, except when it comes to a set of compositions whose ownership is currently being litigated in state court and a set of compositions with uncertain chains of title.  But there are genuine disputes of material fact about whether Apple infringed the copyrights, at least because a jury could find that Apple's conduct does not fulfill copyright law's "volitional conduct" requirement.

Finally, Apple has filed *Daubert* motions about three of the plaintiffs' experts.  All are granted for the reasons set out below.

A case management conference to discuss pretrial and trial dates and consolidation is set for April 19, 2022, at 2:00 pm; a case management statement is due April 12.

## BACKGROUND

### I.        FACTUAL BACKGROUND

This case concerns 101 musical works written or co-written by Harold Arlen, Ray Henderson, and Harry Warren (the "Subject Compositions").  *See* First Amended Complaint

United States District Court
Northern District of California

("FAC") [Dkt. No. 34] ¶¶ 3–5[1]; Plaintiffs' Motion for Partial Summary Judgment ("Pl. Mot.") [Dkt. No. 109] 32 (stating that 101 works are at issue); Opposition to the Pl. Mot. ("Pl. Oppo.") [Dkt. No. 133] 5 & n.3 (agreeing). Arlen, Henderson, and Warren are alleged to have written "some of the most popular" American songs recorded by some of the best-known American singers. *See* FAC ¶¶ 3–5, 6. The Subject Compositions include *Get Happy*, *It's Only a Paper Moon*, *Come Rain or Come Shine*, *Bye Blackbird*, *That's Amore*, and many others. *See* Dkt. No. 34-1 (composition chart).

Arlen, Henderson, and Warren passed away in 1986, 1970, and 1981, respectively. FAC ¶¶ 53, 64, 70. The following plaintiffs claim to own or control their copyrights in the Subject Compositions. *Id.* ¶ 2. SA Music, LLC, ("SA Music") is a corporation of which Harold Arlen's son, Sam, is the sole member. *Id.* ¶¶ 34, 60. William Kolbert is trustee of the trust set up by Harold Arlen. *Id.* ¶ 35. Ray Henderson Music Co. Inc. ("Henderson Music") is a corporation formed by Henderson's children. *Id.* ¶ 68. Four Jays Music Company ("Four Jays") was formed by Warren in 1955. *Id.* ¶ 74. And Julia Riva is Warren's granddaughter and president of Four Jays. *Id.* ¶ 38.

Apple is a corporation that owns and operates the iTunes Store, an online digital music store.[2] *Id.* ¶ 40. Defendants Adasam Limited ("Adasam"), Pickwick[3], Genepool Distribution Ltd. ("Genepool"), and Ideal Music Limited ("Ideal") (collectively, the "Distributor Defendants") are companies organized under the law of and headquartered in the United Kingdom; they are alleged to have—without possessing any rights, permissions, or authorizations—duplicated recordings of the Subject Composition and distributed them to the iTunes Store for consumers to download. *Id.* ¶¶ 43–46; 3:20-cv-02794-WHO, Dkt. No. 58 ¶¶ 42–48; 3:20-cv-02965-WHO, Dkt. No. 45 ¶¶ 40–

---

[1] References to the docket are to case 3:20-cv-0216-WHO unless otherwise noted. Citations to briefs and depositions use original page numbers; citations to other documents use ECF page numbers.

[2] In this case, "iTunes Store" refers only to the U.S. iTunes Store. *See* FAC ¶ 40.

[3] "Pickwick" refers collectively to defendants Pickwick Group Limited, Pickwick International Limited, Pickwick Australia Pty Ltd, and Mastercorp Pty. Ltd. The latter two are incorporated in Australia, but I refer to the companies as being located in the United Kingdom in the body of this Order because no party contends that their Australian citizenship is relevant to these motions.

1   46.  They then reap whatever profits they can from the allegedly infringing copies sold on the

2   iTunes Store.

3   **II.      PROCEDURAL BACKGROUND**

4           In 2019, the plaintiffs sued Apple, the Distributor Defendants, many other digital store

5   owners similar to Apple (like Amazon and Google), and dozens of other allegedly similar serial

6   copyright infringers for roughly the same types of allegations as here in the U.S. District Court for

7   the Central District of California.  *See SA Music, LLC, et al v. Apple, Inc., et al.*, C.D. Cal. 2:19-

8   cv-04073-JFW-RAO, Dkt. No. 1.  The court eventually ordered the plaintiffs to show cause "why

9   the Court should not find that the joinder of the Defendants in this action is improper under Rule

10  20(a)(2) and why the court should not exercise its discretion and sever and dismiss the claims

11  against all of the Defendants except Apple, Inc."  *Id.*, Dkt. No. 218.  The plaintiffs proposed, and

12  the court ordered, that all claims were severed and dismissed without prejudice except against

13  Apple and one "distribution chain" (including Genepool and Ideal).  *Id.*, Dkt. No. 223.  The case

14  was later voluntarily dismissed.  *Id.*, Dkt. No. 258.

15          In this district, the plaintiffs filed suit against Apple and Adasam in March 2020; Apple

16  and Pickwick in April 2020; and Apple, Genepool, and Ideal in April 2020.  Adam, Pickwick,

17  Genepool, and Ideal have never appeared.  Each case proceeded separately (between the plaintiffs

18  and Apple), with Magistrate Judge Jacqueline Scott Corley presiding over the lowest numbered

19  case and supervising discovery in the other two.  Judge Corley directed that the lowest numbered

20  case be reassigned to a district judge because Adasam did not appear.  Dkt. No. 59.  The case was

21  randomly assigned to me in January 2021, discovery continued, and the plaintiffs eventually

22  moved to consolidate the cases for trial.  Dkt. No. 77.  The cases were ordered related, were

23  reassigned to me, and I indicated that I would rule on the motions to consolidate after summary

24  judgment concluded.  The parties agreed that summary judgment briefing in all three cases would

25  be consolidated.  Dkt. No. 103.

26                              **LEGAL STANDARD**

27  **I.       MOTIONS FOR SUMMARY JUDGMENT**

28          Summary judgment on a claim or defense is appropriate "if the movant shows that there is

4

1   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

2   law." Fed. R. Civ. P. 56(a).  To prevail, a party moving for summary judgment must show the

3   absence of a genuine issue of material fact with respect to an essential element of the non-moving

4   party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at

5   trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this

6   showing, the burden then shifts to the party opposing summary judgment to identify "specific facts

7   showing there is a genuine issue for trial." *Id.*  The party opposing summary judgment must then

8   present affirmative evidence from which a jury could return a verdict in that party's favor.

9   *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

10      On summary judgment, the court draws all reasonable factual inferences in favor of the

11   non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility

12   determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

13   facts are jury functions, not those of a judge." *Id.*  However, conclusory and speculative testimony

14   does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See*

15   *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

16   **II.   *DAUBERT* MOTIONS**

17      Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion

18   or otherwise" when: (a) the expert's scientific, technical, or other specialized knowledge will help

19   the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is

20   based on sufficient facts or data; (c) the testimony is the product of reliable principles and

21   methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

22   Fed. R. Evid. 702.  Expert testimony is admissible under Rule 702 if it is both relevant and

23   reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  "[R]elevance

24   means that the evidence will assist the trier of fact to understand or determine a fact in issue."

25   *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558,

26   564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes

27   primarily to relevance.") (internal quotation marks omitted).

28      Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the

United States District Court
Northern District of California

5

knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565.  To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* These factors are "helpful, not definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case." *Id.* (internal quotation marks and footnotes omitted).  "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

The inquiry into the admissibility of expert testimony is "a flexible one" in which "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.  The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 advisory committee's note.

## DISCUSSION

The Copyright Act gives the owner of a copyright in specified types of creative works—including, as relevant here, musical compositions and recordings—certain exclusive rights: (1) "to reproduce" the work; (2) "prepare derivative works"; (3) "distribute copies . . . to the public by sale or other transfer of ownership, or by rental, lease, or lending"; (4) perform the works; (5) publicly display the works; and (6) perform the works through digital audio transmission.  *See* 17 U.S.C. § 106.  "To establish a prima facie case of direct infringement, a plaintiff must show ownership of the allegedly infringed material and demonstrate that the alleged infringers violated at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017).

Because this case concerns musical recordings, two different types of copyrights are relevant.  "Sound recordings and their underlying compositions are separate works with their own distinct copyrights." *Newton v. Diamond*, 388 F.3d 1189, 1191 (9th Cir. 2004); *Williams v. Gaye*, 895 F.3d 1106, 1121 (9th Cir. 2018).  Having a copyright in the composition does not

United States District Court
Northern District of California

automatically give the owner a copyright in a sound recording of it and vice versa.  *See Newton*, 388 F.3d at 1191; *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1249 (C.D. Cal. 2002), *aff'd*, 388 F.3d at 1189.  The plaintiffs claim to own copyrights in the compositions themselves, not the recordings.

The plaintiffs allege that Apple violated their copyrights in the Subject Compositions by (1) reproducing them by making a copy to store on its servers, (2) distributing them by making them available on the iTunes Store, (3) distributing them by selling them, and (4) importing them.

## I.    CROSS-MOTIONS FOR SUMMARY JUDGMENT ON WILLFULNESS

Copyright infringers are subject to increased liability if the infringement is willful.  *See* 17 U.S.C. § 504(c)(2).  "To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 944 (9th Cir. 2011).  Said otherwise, a plaintiff can demonstrate willfulness by showing either actual knowledge or reckless disregard or willful blindness.  In this context, willful blindness requires showing that the defendant "(1) subjectively believed that infringement was likely occurring on their networks and that they (2) took deliberate actions to avoid learning about the infringement." *Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1073 (9th Cir. 2013).  The plaintiffs and Apple each move for summary judgment on the issue of willfulness; I address this portion of their motions together.

### A.  Apple Has Met its Summary-Judgment Burden

Critical to my conclusion that Apple has demonstrated that any infringement[4] it committed was not willful is *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723 (9th Cir. 2019), where the Ninth Circuit addressed willfulness of an online platform for hosting allegedly infringing content uploaded by others.[5]  There, the defendant, Zillow, ran a website that displayed real estate listings.

---

[4] When I refer to "infringement" in this section, I refer to the infringement *alleged* by the plaintiffs—alleged infringement that Apple contests.

[5] After the hearing, Apple filed what it styled a "Motion for Leave to File Statement of Recent Decision" bringing to my attention the district court's order in *Zillow* on remand.  *See* Dkt. No.

United States District Court
Northern District of California

*Zillow*, 918 F.3d at 732.  The listings included, among other things, photos uploaded by real estate agents, brokerages, and listing services.  *Id.*  The owners of the photos sued for infringement.

Among other holdings, the Ninth Circuit overturned a jury verdict that some of the infringement by Zillow was willful.  First, the court held that there was no evidence of actual knowledge.  Zillow maintained agreements with the photo uploaders that included "unambiguous representations by the [uploaders] that they have the authority to assign [the relevant] rights" to Zillow.  *Id.* at 749.  On the evidence there, Zillow's reliance on those contractual representations was reasonable and there was no indication that "Zillow maintained that position in bad faith."  *Id.* (internal quotation marks omitted).  The court also found that there was no evidence that Zillow recklessly disregarded or willfully blinded itself to the infringement.  The plaintiff argued that "Zillow, a sophisticated business with a robust legal team, should have known that its feed provider license agreements were invalid is unavailing."  *Id.*  The court disagreed, holding that Zillow's reliance on the representations was reasonable and that Zillow took sufficient steps to ensure that any photo uploaded was used only in accordance with the rights represented to be properly assigned.  *Id.*

Apple, like Zillow, requires that those who upload recordings to the iTunes Store contractually guarantee that they possess the necessary rights.  *See* Apple's Motion for Partial Summary Judgment ("Apple Mot.") [Dkt. No. 109] 8 (collecting citations); Plaintiffs' Opposition to Apple Mot. ("Apple Oppo.") [Dkt. No. 129] 29 (agreeing and collecting citations).  No one can upload a recording to sell on the iTunes Store without creating an account; the representations of rights are, therefore, tied to individual accounts.  *See* Apple Mot 8; Apple Oppo. 28–29.  Apple has produced its contracts with the Distributor Defendants and the plaintiffs do not dispute that the Distributor Defendants all guaranteed to Apple that they possessed the necessary rights to their

---

162.  It apparently used that vehicle because the Local Rule on statements of recent decisions—the usual vehicle for informing the court of a decision issued after briefing—states that they may be filed "[b]efore the noticed hearing date" but the decision here was issued *on* the hearing date.  Civ. L.R. 7-3(d)(2).  In response, the plaintiffs filed a "memorandum in opposition" arguing the motion was procedurally improper.  *See* Dkt. No. 163.  It also critiqued the motion for including "argument" about the case (because Apple stated the reason it believed the decision relevant) before launching into its own, more extensive argument.  I have reviewed the decision and will disregard both parties' characterizations of it.  *See* Civ. L.R. 7-3(d)(2).

1    uploads. *See* Dkt. Nos. 108-9, 108-11, 108-13, 108-15, 108-17, 108-19.

2        Under *Zillow*, unless there is some evidence that reliance on those representations was

3    unreasonable or in bad faith, that fact precludes a finding of willfulness.  The reason is a

4    straightforward application of willfulness law.  Infringement is not willful if the infringer

5    "believes reasonably, and in good faith, that he or she is not infringing."  *Evergreen Safety*

6    *Council v. RSA Network Inc.*, 697 F.3d 1221, 1228 (9th Cir. 2012).  And if reliance on another's

7    representations that they possess the requisite rights is reasonable and in good faith, a party

8    necessarily would not believe it is infringing.  *Cf. Zillow*, 918 F.3d at 739.[6]

9        Still more, Apple maintains a notice-and-takedown procedure to combat copyright

10    infringement.  Any putative copyright owner can submit a request for Apple to remove a recording

11    that she claims to own.  *See* Apple Mot. 11–13 (collecting citations); Apple Oppo. 32 (discussing

12    these procedures); Deposition of Erin Cook ("Cook Depo.") [Dkt. No. 109-22] at 90:1–20.  Apple

13    informs the party that uploaded the content that there has been a challenge and gives it five days to

14    respond.  Cook Depo. at 90:1–20.  Unless the content provider affirmatively asserts its right to the

15    content within that time, Apple removes the content from the iTunes Store.  *Id.*  Because of the

16    presence of this system, putative copyright owners always have an avenue not just to put alleged

17    infringement on the record but to force the alleged infringer to make an affirmative assertion of

18    rights in the face challenge.  The plaintiffs never used this procedure, strongly indicating that

19    Apple lacked actual knowledge of the alleged infringement.

20        The presence of this takedown system also helps demonstrate a lack of reckless disregard

21    for infringement or willful blindness to it:  Apple reasonably trusted that between the guarantees

22    of the uploaders and the presence of the system, it was not hosting infringing content.  "Instead of

23    providing helpful information" via the takedown procedure to combat the alleged infringement,

24    the plaintiffs "filed suit."  *Zillow*, 918 F.3d at 749.  *Cf. Danjaq LLC v. Sony Corp.*, 263 F.3d 942,

25

26    _____

27 [6] The plaintiffs attempt to distinguish *Zillow* on the ground that the defendant there had a set of rules for determining which of several duplicative photos would be kept up that helped avoid potential infringement.  Apple Oppo. 39 (quoting *Zillow*, 918 F.3d at 733).  That was one piece of

28    evidence that the court looked at in determining whether infringement was willful, it is not an ironclad requirement to avoiding a willfulness finding.

United States District Court
Northern District of California

959 (9th Cir. 2001) (finding a willfulness claim not viable because works were produced under color of title).

The use of this combination—requiring contractual representations of rights and a notice-and-takedown procedure that puts the onus on an uploader to affirmatively assert rights in the face of challenge—is especially fatal to a finding of willfulness in light of the size of the iTunes Store and the potential complexity of the chains of title often at issue. More than ██████ tracks have been uploaded to the iTunes Store since its 2003 launch. *See* Dkt. No. 108-17 ¶ 34. Between ████████████████████ every month. *Id.* This is not to say that merely because a marketplace or online platform is large, it can escape liability. It is only to say that the size of the store makes it more reasonable for Apple to rely on individual uploaders' representations and on a takedown process when assessing its mental state. *Cf. Zillow*, 918 F.3d at 749 (weighing the defendant's "practical ability to independently identify infringing" content in the analysis). It also illustrates that, *without more*, Apple would not have actual knowledge of, recklessly disregard, or be willfully blind to infringement by one particular recording or one particular uploader. A later section of this Order analyzes the chains of title to 71 of the compositions at issue in this case. *See infra* Section III.A.i. As that analysis illustrates, the chains of title to any individual composition are often complicated and muddled—indeed, I deny summary judgment on a handful of them because they are subject to genuine disputes of material fact. *See id.* That also makes it more reasonable for Apple to rely on individual assertions of rights. *See Danjaq*, 263 F.3d at 959 ("The complexity of the chain of title to the various elements of the Bond stories further precludes a jury finding of willful infringement.").

I agree with the plaintiffs that Apple overstates *Zillow*'s holding when it argues that "the Ninth Circuit held that where a defendant was willing to engage in a notice and takedown process, but the plaintiffs filed suit without using that process, infringement was not willful as a matter of law." Apple Mot. 26. But, on these facts, the combination of contractual representations and the presence of a notice-and-takedown procedure meets Apple's burden to show it was not behaving willfully in the absence of contrary evidence. The plaintiffs also argue that "it is impossible for Apple to have had reasonably trusted representations made by these suppliers because Apple knew

United States District Court
Northern District of California

nothing about them when Apple obtained the representations." Apple Oppo. 28–30. But that contradicts *Zillow*'s holding to the contrary. And the plaintiffs contend that Apple's reliance ceased being reasonable because it became obvious that the Distributor Defendants were serial infringers. *See id.* 30–32. I address that argument, and the plaintiffs' affirmative showing, in the next section.

### B.  The Plaintiffs Have Not Shown Genuine Disputes of Material Fact

To resist summary judgment—and make their own summary-judgment case—the plaintiffs argue that the reliance on uploaders' representations and the notice-and-takedown system are insufficient to show a lack of willfulness and that other evidence affirmatively demonstrates willfulness. Because these arguments depend on some of the same evidence, I address them together.

At its most general, the plaintiffs' argument is that it was obvious that the Distributor Defendants were serial infringers—or in their words, "pirates"—from their behavior related to the iTunes Store, and that Apple received notice in various ways that they were. *See* Pl. Mot. 35–46. As a result, say the plaintiffs, maintaining compositions by the Distributor Defendants on the iTunes Store shows willful infringement. *Id.*

As an initial matter, I reject Apple's argument that this theory—a showing of willfulness based on the allegedly obvious infringing nature of the defendant (rather than based on an individual recording)—is never actionable. Apple contends that the notice of infringement necessary to show willfulness must only come from notice about each *specific* composition and appears to suggest that notice must come from the plaintiff. *See, e.g.*, Pl. Oppo. 40–41. Its argument is foreclosed by precedent: In *Unicolors, Inc. v. Urban Outfitters, Inc.*, it was sufficient that the defendant was found to generally maintain a reckless policy about infringement despite its awareness that designs could be infringing; knowledge that that *particular* plaintiff claimed rights to a *particular* design was not necessary. 853 F.3d 980, 991 (9th Cir. 2017).

To reach a contrary conclusion, Apple overreads several other cases. *Danjaq* did not, as Apple contends, establish a categorical rule that a defendant needs "notice . . . of any copyright claims by [the plaintiff] vis-à-vis [the defendant's] properties." Pl. Oppo. 40 (quoting 263 F.3d at

958) (brackets in Apple's brief) (emphasis omitted).  *Danjaq* made that statement as one piece of evidence of many in its analysis of why the infringement could not have been willful.  *See* 263 F.3d at 958.  Though *Luvdarts, LLC v. AT & T Mobility, LLC*, stated that "actual knowledge of specific acts of infringement" was required to impose contributory liability, it is clear in context the Ninth Circuit was contrasting that with a situation in which a system merely *allowed* for infringement or where there was a *possibility* of it.  710 F.3d 1068, 1072 (9th Cir. 2013).

That said, I still reject the plaintiffs' particular arguments for why willfulness—or a genuine dispute of material fact about it—has been demonstrated.  Before discussing individual pieces of evidence, I note that it is insufficient to argue only that Apple "should have known" of a risk because "[t]o say that a defendant 'should have known' of a risk, but did not know of it, is to say that he or she was 'negligent' as to that risk.  Negligence is a less culpable mental state than actual knowledge, willful blindness, or recklessness, the three mental states that properly support a finding of willfulness." *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 833 (9th Cir. 2019) (citations omitted).  Many of the plaintiffs' arguments, though, essentially contend that Apple should have done more or should have known more.

### i.       Procedure for Becoming an iTunes Store Seller

The plaintiffs' first argument is that Apple "recklessly chose" those who uploaded recordings.  *See* Apple Oppo. 20–21; Pl. Mot. 35–28.  They argue that "Apple did not investigate the background of Adasam, Pickwick or Genepool or verify that they had rights they claimed." Apple Oppo. 20.  But, as explained above, reliance on sellers' representations forecloses a finding of willfulness unless it was unreasonable or in bad faith.  *Zillow*, 918 F.3d at 749; *Evergreen*, 697 F.3d at 1228.  That is precisely what Apple required of sellers.  It is insufficient to argue, as the plaintiffs essentially do on this point, that Apple "should have known" of a risk.  *Erickson*, 921 F.3d at 833.  To the extent the plaintiffs' argument is that Apple should have performed "background check[s]" or "due diligence," *see* Pl. Mot. 36–37, on the Distributor Defendants when they created accounts or uploaded, that is not an issue of willfulness.  The question for present purposes is whether the infringement was willful, not whether Apple did all it possibly could to prevent infringement.  Apple was not willfully infringing merely because it did not

12

exhaustively background check the hundreds of thousands of uploaders on its store.

### ii.     Takedown Notices

Most substantially, the plaintiffs rely on takedown notices that Apple received for Adasam, Pickwick, and Genepool.  *See* Apple Oppo. 21–22; Pl. Mot. 38–41.  According to the plaintiffs, "major record labels" and others sent takedown requests for thousands of recordings—3,154 by Adasam, 4,262 by Pickwick, and 1,023 by Genepool—by the Distributor Defendants.  *See* Dkt. No. 111-15 at 735.

As noted, anyone, including putative copyright owners, can submit a request for Apple to remove their work from the iTunes Store.  *See* Apple Mot. 11–12 (collecting citations describing policy); Apple Oppo. 2 (discussing takedowns).  Apple then gives the content provider that information and gives it five days to respond by asserting its rights.  Apple Mot. 12 (collecting citations).  If it does not respond, Apple removes the content from the iTunes Store.  *Id.* (collecting citations).

Apple first argues that plaintiffs' use of the takedown notices violates Federal Rule of Evidence 404.  Pl. Oppo. 52.  Under that rule, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1).  More specifically, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).  Apple argues that the takedown notices are this sort of evidence.  Pl. Oppo. 52.  It misunderstands the rule.  The plaintiffs are not using the takedown notices to show that, because the Distributor Defendants (or Apple) infringed in the past, they have a propensity to infringe—which is what the rule bars.  Instead, the plaintiffs are using the takedown notices to show Apple's *knowledge* or *awareness* that the plaintiffs were infringers.  The Rule is explicit that evidence of specific acts "may be admissible for another purpose," including providing "knowledge." Fed. R. Evid.

404(b)(2).[7]

The problem for the plaintiffs' reliance on takedown notices, however, is that the particular evidence in this case does not bear out the plaintiffs' claims that these numbers of takedown notices would have made it sufficiently obvious to Apple that the Distributor Defendants were serial infringers whose entire catalogues must be removed. The Apple employee in charge of processing copyright infringement notices testified that she noticed when a particularly large number of disputes were filed about a content provider. *See* Cook Depo. at 115:22–116:5. But there is no evidence that the Distributor Defendants' numbers were so abnormal as to raise suspicion.[8] The plaintiffs have introduced no evidence to dispute that; for instance, they introduce no evidence showing that these numbers are meaningfully out of step with other iTunes sellers. The iTunes Store has had ██████████ of recordings uploaded to it. Dkt. No. 108-7 ¶ 34. Though the plaintiffs separate out the takedown requests by recording, Apple points out that those requests were bundled into only a few hundred specific notices—215 for Adasam, 184 for Pickwick, and 66 for Genepool. *See* Declaration of Erin Cook [Dkt. No. 109-1] ¶¶ 5, 7, 9. These numbers are from a period of 10 years. *Id.* 38 of the Subject Compositions received takedown notices. Even using the plaintiffs' framing of total number of recordings, the recordings about which there were notices were only a fraction of the Distributor Defendants' total uploads—6.35 percent for Adasam, 2.6 percent for Genepool, and 1.6 percent for Pickwick. Pl. Oppo. 43. Said otherwise, Apple was not even arguably informed about any problem about between 93 and 98.4

---

[7] As a fallback, Apple contends this evidence is inadmissible under FRE 403. Pl. Oppo. 52–53. If the evidence were being used to show that because Apple (allegedly) infringed before, it was more likely to infringe in this case, I would agree (though FRE 404 is designed to deal with that situation). But here, as explained in the body of this Order, the evidence is being used to show Apple's alleged awareness of or willful blindness to the Distributor Defendants (alleged) obvious serial infringement, so the danger of unfair prejudice does not "substantially outweigh" the evidence's probative value. *See* Fed. R. Evid. 403. Nor did any of Apple's cases address a situation like this; all of them excluded evidence being used, essentially, to show propensity to infringe. *See* Pl. Oppo. 52.

[8] Apple objected on privilege grounds when the plaintiffs asked about Cook's discussions with legal counsel about high-volume takedown notices. *See* Cook Depo. at 116–17. The plaintiffs make much of that in their Reply. Dkt. No. 144. My decision is not based on any interactions with Apple's counsel, nor do I grant it based on a lack of evidence that Apple is shielding behind a privilege.

United States District Court
Northern District of California

percent of the Distributor Defendants' uploads.  As a result, these takedown notices alone do not mean that it would have been so obvious to Apple that these particular distributors were so suspect that it *willfully blinded itself* or *recklessly disregarded* an almost certain fact that their *entire catalogues* were infringing.

The plaintiffs argue that "every time" a takedown notice was given to the Distributor Defendants, they either voluntarily removed the recording or Apple removed it because there was no assertion of rights.  Pl. Mot. 39–40.  They also rely on the Distributor Defendants' communications with Apple about these notices.  Adasam responded to Apple's takedown notices with a uniform form response that stated it had been removed.  Pl. Mot. 40 (collecting citations).  Genepool asked if "he"—presumably the proprietor—received more takedown notices than "anyone else?"  *Id.*  Apple's employee responded that he did not and included a winking-face emoji.  *Id.*  And Pickwick "stopped responding to notifications."  *See* Declaration of Matthew Schwartz ("Schwartz Decl.") [Dkt. No. 110-17] ¶ 15.

In light of the discussion above, these email interactions also do not introduce a genuine dispute of material fact about Apple's willfulness.  To reiterate, there is no evidence that Apple perceived the Distributor Defendants' takedown frequency to be suspicious, most of their catalogues were not challenged, these compositions were a miniscule percentage of those on the iTunes Store, and each of the Distributor Defendants had already warranted to Apple that it had the requisite rights.  Further, the mere fact that a user does not contest a takedown notice would not necessarily put Apple on notice that it lacked the rights to that particular composition (let alone to *all* of its compositions); it may be, for instance, that sorting out the chain of title is not worth the effort of keeping that particular composition up.

For this point—and more broadly—the plaintiffs rely on *Unicolors*.  There, the Ninth Circuit held that there was sufficient evidence to uphold the jury's finding of willfulness.  *Unicolors*, 853 F.3d at 991.  The plaintiff presented evidence that the defendant clothing seller "adopted a reckless policy with regard to copyright infringement."  *Id.*  In particular, it "made no attempt to check or inquire into whether any of the designs it used in its apparel were subject to copyright protections."  *Id.*  It purchased "thousands" of designs and had a "general awareness"

such designs might be copied yet it took no "affirmative action to determine if the specific designs it is using [we]re copyrighted." *Id.* And it took no steps to determine whether the challenged design in that case was copyrighted. Here, as explained, there *is* evidence that Apple, unlike the *Unicolors* defendant, did have a policy to stop copyright infringement. The plaintiffs might have been able to get around that reality with sufficient evidence of recklessness or willful blindness, but they have not presented it.

The plaintiffs also rely on *Columbia Pictures Industries, Inc. v. Fung* to argue that "the tracks at issue here are so 'well-known that it would have been objectively obvious to a reasonable person that the material . . .[was] not licensed to random members of the public, and that the [] use was therefore infringing.'" Plaintiffs' Reply ISO Pl. Mot. ("Pl. Reply") [Dkt. No. 144] (quoting 710 F.3d 1020, 1043 (9th Cir. 2013)). They take that statement out of context. *Columbia Pictures* held that someone could be liable for contributory infringement because "the record is replete with instances of Fung actively encouraging infringement, by urging his users to both upload and download particular copyrighted works, providing assistance to those seeking to watch copyrighted films, and helping his users burn copyrighted material onto DVDs." 710 F.3d at 1043. And in *that* context, the Ninth Circuit wrote that those DVDs were sufficiently well-known to put someone on notice of infringement. Here, there are many differences, but a few suffice: there is no evidence that Apple "actively encourage[s]" users to upload "particular" works that are likely to infringe, provides assistance getting around copyright laws, or actively makes unauthorized copies. Unlike a site designed to host pirated DVDs, the iTunes Store hosts millions of songs and the chains of title of those songs can be byzantine.

The plaintiffs rely on an Apple policy and practice called the ████████████ Pl. Mot. 44–46; Apple Oppo. 22–24. This non-public policy permits ████████████████████ ████████████████████████████████████████████ See Pl. Oppo. 58 (collecting citations). The idea, says Apple, is that many people will try to ████████████████████████████ *Id.* (collecting citations). The program

United States District Court
Northern District of California

1  essentially ████████████████████████████████████████████████

2  ████████████████████████████████████ *Id.*  The plaintiffs argue that Adasam, Pickwick,

3  and Genepool had, respectively, ████████████████████████████████████████

4  ██████████████████████████ of the Subject Compositions.  There is no record that the

5  Distributor Defendants objected.  Instead, someone at Adasam emailed to ask ████████████

6  ████████████████████████████████████████████████████████████████

7  Schwartz Decl. ¶ 46.

8       That so many of the Distributor Defendants' ████████████████ does not mean that

9  Apple's reliance on *all* of their contractual representations was unreasonable.  There is no

10  evidence that anyone at Apple ever used this information to make judgment calls about who

11  should be permitted on the iTunes Store.  The ████████████████████ does not show that

12  someone is necessarily infringing a copyright, it shows ████████████████████████████

13  ████████████████████.  It is possible for multiple people to have licenses to the compositions or

14  for the chain of title to be complex, resulting in genuine confusion about ownership.  In any event,

15  the question here is willfulness, not whether Apple could have done more to prevent infringement.

        iv.    ***Blagman* Lawsuit**

17       The plaintiffs next rely on a 2012 copyright infringement lawsuit against Apple in the

18  Southern District of New York, *Blagman v. Apple Inc., et al.*, 12-cv-5483 (S.D.N.Y.), by a

19  rightsholder alleging similar infringement to that here.  *See* Pl. Mot. 41.  Adasam and Pickwick

20  were defendants there too, and their infringement was alleged under the same basic theory as here.

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████

25  ████████████████████████████████

26       The mere fact that the other lawsuit existed was not sufficient to show that Apple actually

27  knew that Adasam and Pickwick's *entire catalogs* were infringing (which is the only theory that

28  would rope in all of the Subject Compositions).  ████████████████████████████████

United States District Court
Northern District of California

███████████ The email about Adasam, moreover, does not show that Apple actually knew that Adasam's entire catalog was infringing, or that it recklessly disregarded or was willfully blind to the risk that this was so. To the contrary, Apple affirmatively sought an assurance from Adasam (on top of the previous contractual guarantee) and Adasam provided it. *See* Pl. Mot. 41–2 (conceding this). ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████ Under the circumstances, there is no evidence that Apple's reliance on Adasam's representations was not in good faith and, in light of Adasam's unambiguous representation, Apple's reliance was not unreasonable. *See Evergreen*, 697 F.3d at 1228 ("Continued use of a work even after one has been notified of his or her alleged infringement does not constitute willfulness so long as one believes reasonably, and in good faith, that he or she is not infringing.").

### v.    Software Identification

The plaintiffs argue that Apple was able to tell when newly uploaded recordings matched those already for sale. Pl. Mot. 46–50. Apple uses a third-party software called Gracenote that scans songs upon upload. *See* Deposition of Nicholas Williamson [Dkt. No. 110-7] at 26:21–29:21. The software can determine whether a song is already on the iTunes Store. *Id.* It is used for features like permitting users to retrieve the remainder of an album based on a single song. The plaintiffs argue that Apple could have used this technology to determine when recordings were duplicates of those already on the iTunes Store. Pl. Mot. 46–50.

That this software exists and could (hypothetically) be used in this way does not show willfulness.[9] Again, it is insufficient for present purposes "[t]o say that a defendant 'should have known' of a risk, but did not know of it," because that shows, at most, negligence. *Erickson*, 921 F.3d at 833. Apple has put other methods in place to remove infringing content (methods the plaintiffs here did not attempt to use).

---

[9] The parties debate whether the software could be used in this way at all. *Compare* Pl. Mot. 46, *with* Pl. Oppo. 49. Because the plaintiffs' reliance on the software is misplaced on other grounds, I do not address this other debate.

United States District Court
Northern District of California

United States District Court
Northern District of California

### vi.  Failure to Terminate Repeat Infringers

The plaintiffs also contend that Apple had no policy for terminating repeat infringers.  Pl. Mot. 46 (collecting citations).  Even if true, that does not show willfulness on these facts.  Apple's notice-and-takedown procedure is designed to remove any composition when one party asserts rights and the uploader is not willing to challenge that assertion.  As a result, unless two parties are going to engage in a full dispute over the rights to a work—in which case, it would be difficult to say that Apple's alleged infringement would be willful in any event—any potentially infringing work *will* be removed if the rights-owner wants it to be.  Once again, that Apple could have done more does not mean it recklessly disregarded or was willfully blind to the risks on its store.  *Erickson*, 921 F.3d at 833.  To the contrary, it required contractual representations and permitted any person at any time to initiate a takedown.  The plaintiffs' only proffered contrary authority has nothing to do with willfulness; it discussed policies for termination of repeat infringers in the context of the Digital Millennium Copyright Act's requirements for receiving safe harbor under the act.  *See Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 614 (9th Cir. 2018).

### vii.  Evidence Particular to Adasam

The plaintiffs point to several pieces of evidence that apply only to Adasam.  They point out that Eric Records, a record label, emailed Apple three times into 2013 to report that Adasam had repeatedly infringed its copyrights via the iTunes Store.  Schwartz Decl. ¶ 26.  It emailed again about Adasam in 2018.  *Id.* ¶ 43.[10]  I incorporate the discussion of takedown notices above.  For the same reasons that those several hundred takedown notices do not, on these facts, demonstrate willfulness, these four emails do not either.  These four assertions of rights over a decade-long span would not put a reasonable company on notice that they *must* exorcize a thousand-strong catalog.  *See Evergreen*, 697 F.3d at 1228 (holding that mere assertions of rights are insufficient to show willfulness when reliance on representations of rights is reasonable and in good faith).

---

[10] The plaintiffs reference two other specific notifications from record labels, but their brief does not tie them to the Distributor Defendants, as opposed to alleged infringing content more generally.  *See* Pl. Mot. 43–44.

1   The plaintiffs also put Adasam's address into Google Maps and argue that it operated out

2   of a cleaning products facility in the U.K., for which Apple had the address.  *See* Schwartz Decl. ¶

3   61.  As explained above, when it comes to the issue of willfulness, Apple was not required to carry

4   out a background check-style investigation of its scores of sellers, including hunting down images

5   of the facilities from which Adasam operated.  This does not transform Apple's alleged

6   infringement into willful infringement.

7         **C.**     **Conclusion on Willfulness**

8   Apple has shown that its alleged infringement was not willful.  The plaintiffs have not

9   introduced any evidence that put that conclusion into genuine dispute.  Apple's motion for

10   summary judgment on willfulness is GRANTED and the plaintiffs' is DENIED.

11   **II.**     **APPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

12   Apple moves for summary judgment on two other issues.  One of the ways that the

13   plaintiffs seek to show that Apple infringed is by "making available" the Subject Compositions on

14   the iTunes Store—as opposed to actually making sales.  Apple argues that this "making available"

15   theory is not cognizable under the Copyright Act.  Relatedly, it contends that it cannot be liable for

16   putting up promotional clips of the Subject Compositions.

17         **A.  Making Available Right**

18   The scope of a "making available" theory of copyright infringement has resulted in several

19   decades of disagreement and debate among courts.  I conclude for the reasons that follow that

20   Apple placing the recordings or promotional clips on the iTunes Store can qualify as "distribution"

21   under the Copyright Act.

22   Because the question is one of statutory interpretation, I "begin[] with the text of the

23   statute."  *Matao Yokeno v. Sawako Sekiguchi*, 754 F.3d 649, 653 (9th Cir. 2014).  The Copyright

24   Act gives a copyright owner the exclusive right to, among other things, "distribute copies or

25   phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by

26   rental, lease, or lending."  17 U.S.C. § 106(3).  From its language, the provision might reasonably

27   be read as Apple appears to read it: "distribution . . . by sale" means that the only act of

28   infringement possible is if the defendant makes a sale (and so too with transfer, rental, leasing, and

lending).  But the right might also reasonably be understood to be infringed by making the work available for sale (or transfer, rental, lease or lending) because that too interferes with exclusivity of distribution by sale (and the other categories).  *Cf. A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001), as amended (Apr. 3, 2001) (subsequent history omitted) ("Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights.").  Accordingly, I will treat the statute as at least ambiguous and turn to other interpretive tools.

The clearest indication that the distribution right includes "making available" recordings is that the modern copyright statute implements the World Intellectual Property Organization Copyright Treaty ("the Treaty") and the Treaty explicitly covers a making available theory and grounds it in the distribution right.  The Treaty, adopted in 1996, addresses the "right of communication to the public."  It provides that "authors of literary and artistic works shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, *including the making available to the public of their works* in such a way that members of the public may access these works from a place and at a time individually chosen by them."  WIPO Copyright Treaty art. 8, Dec. 20, 1996, U.N.T.S. 2186 (emphasis added).  In 1998, the Senate ratified the Treaty, and Congress passed the Digital Millennium Copyright Act ("DMCA"); one explicit purpose of the DMCA was to implement the Treaty.  *See* Pub. L. 105–304, October 28, 1998, 112 Stat 2860 (adding the Treaty to list of treaties implemented by the Copyright Act).  But Congress left in place the pre-existing rights, indicating that they or a subset of them covered the rights it was enforcing under the Treaty.  And when a statute implements a treaty, judicial interpretation "begin[s] with that international agreement," *Bond v. United States*, 572 U.S. 844, 855 (2014), and the statute "ought never to be construed to violate the law of nations if any other possible construction remains," *Murray v. Schooner Charming Betsy, The*, 6 U.S. 64, 118, 2 L. Ed. 208 (1804) (Marshall, C.J.).

The diplomatic history of the Treaty and the legislative history of the DMCA drive this interpretation home in even stronger terms.  *See Medellin v. Texas*, 552 U.S. 491, 507 (2008) (explaining that treaties should be interpreted in light of the "the negotiation and drafting history

of the treaty as well as the postratification understanding of signatory nations" (internal quotation marks and alteration omitted)). The Copyright Office has chronicled the drafting of the Treaty in detail. *See* Copyright Office, the Making Available Right in the United States 10–14 (Feb. 2016) ("Copyright Office Rep."). In brief, there was robust discussion about the making available right; the United States argued that the distribution right covered a making available theory, so states should be able to enforce the right either through a stand-alone provision or through pre-existing rights. *See id.* In drafting the DMCA, the Copyright Office studied the issue and told Congress that the existing rights were adequate to fulfil treaty obligations. *See id.* 15 n.67 (hearing testimony). And the committee report on the bill concluded the same thing. *See* H.R. Rep. No. 105-551, pt. 1, at 9 (1998) ("The treaties do not require any change in the substance of copyright rights or exceptions in U.S. law.").

The Ninth Circuit, moreover, has understood "distribution" in the Copyright Act to include making works available. In one case, the Ninth Circuit held that users of the online service Napster infringed the distribution right simply by "upload file names to the search index for others to copy." *Napster*, 239 F.3d at 1014. More recently, the Ninth Circuit reaffirmed and relied on that holding when the central question was about the scope of the distribution right. *See Perfect 10*, 508 F.3d at 1162. And, though this issue has split district courts, many have reached this conclusion as well. *See, e.g.*, *Lions Gate Films Inc. v. Saleh*, No. 214CV06033ODWAGR, 2016 WL 6822748, at *3 (C.D. Cal. Mar. 24, 2016) ("By hosting copies of the film online, Defendants . . . made copyrighted material available for download, which is a violation of Plaintiff's distribution rights.") (citing *Napster*, 239 F.3d at 1014).

This view—that "distribution" can include uploading material to a database for consumers to peruse and choose whether or not to download or buy—is also the one that the Copyright Office reached in a comprehensive and congressionally mandated review of the law. *See* Copyright Office Rep. 47–51.[11] It is the view endorsed by the leading copyright law treatise. *See* Nimmer

---

[11] The Ninth Circuit has not definitely decided whether the Copyright Office is entitled to *Chevron* deference, *see Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 755 F.3d 1038, 1041 (9th Cir. 2014), as amended (July 9, 2014), but it does "defer to the Copyright Office's interpretations in the

on Copyright § 8.11[B][4][d] (2013).  And it is the view adopted by other courts of appeals.  *See, e.g.*, *Diversey v. Schmidly*, 738 F.3d 1196, 1203 (10th Cir. 2013); *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997).

     To argue otherwise, Apple and several district courts that have taken its view contend that *Perfect 10* and *Zillow* have foreclosed this theory.  I do not read them that way.  *Perfect 10*, as noted, reiterated *Napster*'s holding about distribution, so it would be odd for it to then contradict it.  The part Apple cites, moreover, held that when Google *indexed* an image, it did not qualify as distribution because the image's website owner was the one distributing.  *Perfect 10*, 508 F.3d at 1162.  If anything, that suggests something like the iTunes Store—which does not just index, it includes actual copies—*would* qualify.  And *Zillow* held that the *display* right under the Copyright Act does not support a "making available" theory; it said nothing of the distribution right.  *Zillow*, 918 F.3d at 736.[12]

     I recognize that one of the district courts that has adopted a different view than I do here involved the same plaintiffs as in this case.  *See SA Music, LLC v. Amazon.com, Inc.*, No. 2:20-CV-00105-BAT, 2020 WL 3128534, at *7 (W.D. Wash. June 12, 2020) (subsequent history omitted).  That court's opinion distinguished *Napster* on the ground that a service like the iTunes Store (there, Amazon's music store) requires payment before download.  Napster's users, in contrast, put up files that anyone could download without payment.  That is a more-than-plausible distinction, and I appreciate that court's point.  As I see it, however, nothing in *Napster*'s reasoning turned on the free nature of the product; it held, without qualification, that when a user uploaded a file for others to copy, it "distributed."  *Napster*, 239 F.3d at 1014.  And it seems to me that whether the file stands behind the click of a link or behind a credit card payment, the defendant has distributed the work to the world at large all the same.  It is difficult to see why the

---

appropriate circumstances," *Alaska Stock, LLC v. Houghton Mifflin Harcourt Pub. Co.*, 747 F.3d 673, 684 (9th Cir. 2014).  No party has argued for deference here and I reach the same conclusion the Copyright Office did, so I do not address the issue.

[12] That portion of *Zillow* also appears to be dictum; the court immediately went on to hold that it resolved the case based on the "most important" consideration there: the jury was never instructed on this theory.  *Zillow*, 918 F.3d at 736.

copyright laws are more offended by the behavior of the *uploader* or *host* just because the *end-user* has to put in more work to access the infringing material.

### B.  Promotional Streams

One of the plaintiffs' theories of liability is that Apple infringed by reproducing and distributing copies of recordings of the Subject Compositions as "promotional streams."  Apple argues that it is entitled to summary judgment on this issue because the plaintiffs "have failed to produce copies of the allegedly infringing promotional clips."  Apple Mot. 32.

This portion of Apple's motion is denied.  The plaintiffs propounded requests for admission asking Apple to admit that recordings of each of the Subject Compositions were "available for promotional stream" in the iTunes Store; Apple responded that each was available "at some point . . . including as a streaming clip."  *See* Dkt. No. 115-15 at 805 (Adasam), 842 (Pickwick), 881–82 (Genepool).  As a result there is (at least) a genuine dispute of fact about whether Apple put all of the recordings on the iTunes Store as promotional clips.  Apple responds, citing a district court cases, that "[c]ourts 'require the non-moving party with the burden of proof in copyright cases to produce the alleged infringed and infringing products for comparison purposes at the summary judgment stage.'"  Apple Mot. 32 (quoting *Berkla v. Corel Corp.*, 66 F. Supp. 2d 1129, 1139–40 (E.D. Cal. 1999)).  But that court was discussing a more traditional claim of infringement in which two different works are compared to determine substantial similarity.  The plaintiffs' claim about promotional clips, however, is that the Subject Recordings *themselves* were made available as shortened streams.  None of Apple's other cited cases nor the cases cited in *Berkla* establishes a rule that a plaintiff must produce a copy of the recording to compare (to itself) in circumstances like these.  Apple's admissions that the recordings were made available this way is sufficient evidence to foreclose summary judgment in its favor.[13]

Apple's motion for summary judgment is DENIED on these two issues.

---

[13] For clarity, I do not decide this dispute in the plaintiffs' favor based on their argument that the summary-judgment *burden* should be placed on Apple.  *See* Apple Oppo. 56–57.  I just conclude that the plaintiffs *have* met their summary-judgment burden with this evidence.

United States District Court
Northern District of California

United States District Court
Northern District of California

### III.   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Aside from the issue of willfulness, the plaintiffs move for summary judgment on four subsidiary issues needed to ultimately show liability: that (1) they own or control exclusive rights in the Subject Compositions, (2) the copyrights on the Subject Compositions are valid, (3) the recordings embody the Subject Compositions, and (4) Apple has no valid licenses.  The plaintiffs also move for summary judgment on the claim that Apple infringed its exclusive rights of (1) reproduction, (2) distribution by making available the Subject Compositions, (3) distribution through sales, and (4) importation.

#### A.  Subsidiary Issues

##### i.   Ownership and/or Control of Exclusive Rights

The plaintiffs move for summary judgment that they own or control the copyrights for the Subject Compositions.  Pl. Mot. 9–13.  "Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred and owned separately."  *DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 983 (9th Cir. 2017) (internal quotation marks and citation omitted).  Modern copyrights have two terms, an original term and a renewal term.  *See* 17 U.S.C. § 304(a)(2).  As a general matter, Section 304(b) of the Copyright Act permits, as relevant here, a work's author or their heirs to "terminate a grant of rights to a copyrighted work made by the author or his heirs to a third party prior to the statute's effective date of January 1, 1978."  *Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1040 (9th Cir. 2005); *see* 17 U.S.C. § 304(b).

As explained below, the plaintiffs submitted several new pieces of evidence in their reply brief.  While that is often improper, they did so here in response to specific arguments Apple made in its Opposition about alleged deficiencies in the chain of title of the Subject Compositions.  Based on the nature of the issue and each party's burden at summary judgment, it is fair for the plaintiffs not to have foreseen every particular deficiency Apple would attempt to identify to show genuine disputes of material fact.  But because the plaintiffs introduced new evidence in reply, I permitted Apple to submit a supplemental brief to address it.  *See* Apple's Supplemental Brief in Opposition ("Pl. Supp.") [Dkt. No. 166]; *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996)

1    ("[W]here new evidence is presented in a reply to a motion for summary judgment, the district

2    court should not consider the new evidence without giving the non-movant an opportunity to

3    respond." (internal quotation marks, alteration, and citation omitted)).

### 1.   Standing

4

5    As a preliminary matter, the plaintiffs argue that Apple lacks standing to challenge their

6    ownership or control of the copyrights. *See* Pl. Mot. 20. According to them, a third-party cannot

7    challenge the validity of a transfer of a copyright when the parties to the transfer do not contest it.

8    *Id.* The plaintiffs are incorrect. As the Ninth Circuit has explained in rejecting this same

9    argument, "[a]lthough a third party may not raise noncompliance with 17 U.S.C. § 204(a)'s

10   writing requirement as a defense to a copyright transfer where the parties to the transfer do not

11   dispute its existence, *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1157 (9th

12   Cir. 2010), a third party is not foreclosed from challenging a plaintiff's ownership for purposes of

13   standing." *DRK Photo*, 870 F.3d at 986 (citation omitted). That is what Apple seeks to do here—

14   defend itself by showing that the plaintiffs cannot sue for infringement.

### 2.   Undisputed Copyrights

15

16   Apple does not dispute that the plaintiffs own 30 of the Subject Compositions. *See* Pl.

17   Oppo. 9–25 (disputing ownership of 71 copyrights). The plaintiffs have presented sufficient

18   evidence to meet their summary-judgment burden that they own the copyrights of these

19   compositions. In particular, the plaintiffs have each submitted declarations that they own the

20   pertinent copyrights. *See* Pl. Mot. 10 (collecting citations). And they have provided copyright

21   registrations for them. *See id.* (collecting citations). In the absence of any evidence to the

22   contrary or dispute from Apple, that evidence is sufficient to show ownership. *See, e.g.*, *Micro

23   Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998). The plaintiffs are therefore entitled to

24   summary judgment that they own the 30 copyrights not discussed in the following sections.[14]

25

26   —————————————

[14] This determination, and all of my determinations in this section, are based solely on the

27   evidence offered by the plaintiffs and Apple in this particular case. Any findings here have no
     preclusive effect on anyone but Apple. These principles would, of course, apply in any case, but I

28   emphasize them in light of the state-court litigation over some of the rights in this case and the
     parties' attempt to use that case to their advantage in this one (as discussed below).

### 3. Henderson Compositions

Apple disputes the plaintiffs' ownership of the rights to all of the Subject Compositions originally owned by Henderson. *See* Pl. Oppo. 11–15. The parties agree that various music companies owned the Henderson composition copyrights until Henderson's children served termination notices on them. *See id.* 12; Pl. Reply 13. Accordingly, both parties agree that those termination notices meant the copyrights in the Henderson works reverted to Henderson's children. *See* Pl. Oppo. 12; Pl. Reply 13.

Apple's objection is to the next step in the chain of title. According to it, there is no evidence, contrary to the plaintiffs' claims, that Henderson's children transferred the rights to Henderson Music. *See* Pl. Oppo. 12. The plaintiffs respond that they have introduced into evidence a memorandum (the "Henderson Memo") documenting the assignment. *See* Pl. Reply 11. Memoranda by the transferring parties documenting a previous assignment are generally sufficient evidence under the copyright laws. *See* 17 U.S.C. § 204(a); *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1429 (9th Cir. 1996). Apple does not dispute that the Henderson Memo is authentic or could suffice to prove the transfer. Instead, it offers three objections to that memo. *See* Pl. Oppo. 12. But because I disagree with all of them, Apple has not shown a genuine dispute of material fact about the ownership of the Henderson compositions.

First, Apple invokes the best evidence rule; under that rule of evidence, generally, "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. Apple argues that the plaintiffs needed to produce the original assignment. But here, the evidence indicates that it is more likely than not that there was no written assignment to begin with. No party has produced a deposition statement or other evidence that the assignment from Henderson's children to Henderson Music was done in writing. The Henderson Memo is not being used to prove the content of any past writing; it is being used for its own content.

Second, Apple objects to the Henderson Memo as hearsay. *See* Pl. Oppo. 14–15. With some exclusions and qualifications not relevant here, hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to

prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  Unless an exception applies, hearsay is inadmissible.  Fed. R. Evid. 802.  Apple argues that because the Henderson Memo states that the assignment is valid and is being used to prove the truth of that assertion, it is hearsay.  Pl. Oppo. 15.  But the Henderson Memo falls within the "independent legal significance" doctrine.  Under that rule, a document like this is not hearsay because its significance "lies solely in the fact that it was made."  Fed. R. Evid. 801 advisory committee's note to subdivision (c). That is why instruments like contracts can be admitted into evidence even though they are out-of-court statements.  *See, e.g.*, *Stuart v. UNUM Life Ins. Co. of Am.*, 217 F.3d 1145, 1154 (9th Cir. 2000).  And though this document is not a contract, it has independent legal significance under Section 204 of the Copyright Act as a document sufficient to demonstrate ownership and, in any event, the Ninth Circuit has held that letters memorializing a prior agreement (there, a plea agreement) also fall within the reach of the doctrine.  *United States v. Rubier*, 651 F.2d 628, 630 (9th Cir. 1981).

Finally, Apple argues that the Henderson Memo creates genuine disputes of fact even if admissible.  Pl. Oppo. 15.  Its first reason for thinking this is that Henderson Music's person most knowledgeable does not state in her declaration filed in this case that an assignment occurred.  *Id.* That is irrelevant.  It is not as if she testified that one did *not* occur.  The memo itself is competent evidence that it did.  Apple also briefly argues that the memo leaves out the terms of the assignment and, so, the assignment may be invalid.  That is not a genuine dispute about the authenticity of the assignment, it is speculation.  The plaintiffs produced evidence sufficient to meet their initial burden of production: a memorialization of a transfer of rights.  Apple had to raise a concrete dispute of material fact that the assignment was invalid, not just an unsupported possibility.  In fact, the Ninth Circuit has held that "[t]he rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so.  It doesn't have to be the Magna Carta; a one-line pro forma statement will do."  *Radio Television Espanola S.A. v. New World Ent., Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999) (internal quotation marks and citation omitted).

1

#### 4.   Arlen Compositions

Apple next challenges the plaintiffs' rights to 15 of the compositions originally by Arlen. *See* Pl. Oppo. 16–18.  For the first four compositions[15], Apple only challenges one step in the chain of title.  The parties agree that Arlen assigned his rights to a company called A-Music Corp. ("A-M Music").  *Id.* 16; Pl. Reply 26.  The parties also agree that Sam Arlen eventually served Section 304(b) termination notices on an entity called Warner/Chappell Music, Inc. ("Warner/Chappell") for three of the compositions (and that Sam Arlen subsequently assigned his rights to SA Music).  The issue, says Apple, is that there is no documentation of a transfer between A-M Music and Warner/Chappell.  Pl. Oppo. 16.  The plaintiffs' Reply, however, argues that Warner/Chappell was A-M's exclusive agent, so that was the reason for service on it.  *See* Pl. Reply 26.  Their evidence supports that finding: the assignment from Arlen to A-M Music explicitly provides that the compositions "shall be distributed and exploited by a subsidiary or affiliate of Chappell & Co., Inc.," which "shall be the sole selling agent of said compositions." Dkt. No. 111-13 at 42.  That is sufficient evidence of the creation of the agency relationship; Apple has introduced no countervailing evidence and does not dispute that this Chappell is essentially the same as or a predecessor of Warner/Chappell.

In its supplemental brief, Apple replies that "Plaintiffs cite no authority, and Apple is aware of none, permitting an entity's exclusive agent to be the proper grantee of a termination notice served under Section 304(c) of the Copyright Act, where the agent did not hold the rights being terminated."  Pl. Supp. 4.  But it is a general principle of agency law that agents may represent principles for all purposes within the scope of their authority—including the relatively routine task of being served legal notices.  *See, e.g.*, Restatement (Third) Of Agency § 2.02.[16]

---

[15] Specifically, *Come Rain Or Come Shine*, *Cakewalk Your Lady*, *I Wonder What Became Of Me*, and *Any Place I Hang My Hat Is Home*.

[16] Neither party applied the law of a particular state to ownership of this exact set of compositions for this precise purpose.  But applying California law (as the parties elsewhere do) would lead to the same result: "An agent represents his principal for all purposes within the scope of his actual or ostensible authority, and all the rights and liabilities which would accrue to the agent from transactions within such limit, if they had been entered into on his own account, accrue to the principal."  Cal. Civ. Code § 2330.

United States District Court
Northern District of California

And Section 304 of the Copyright Act explicitly provides that,

> In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, *or by their duly authorized agents*. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author *or his or her duly authorized agent* or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, *or by their duly authorized agents*.

17 U.S.C. § 304(c)(4) (emphasis added).  The statute, in other words, is well aware of agency principles yet nowhere displaces them.  It would be anachronistic if agents could sign termination notices on behalf of their principals but not receive termination notices on behalf of their principals.  In the absence of any contrary evidence from Apple, the plaintiffs are entitled to summary judgment on this issue.

Next, Apple argues that eight of the compositions[17] were originally assigned from Arlen to Mills Music Inc. ("Mills") but, according to Apple, it is unclear whether Mills also owned the renewal rights and Arlen purported to assign them to another company called Arko Music Corp. ("Arko") nearly thirty years later.  *See* Pl. Oppo. 16–18.  The plaintiffs admit that there "appeared to be confusion" about which entity owned the renewal copyright term.  Pl. Reply 23.  But, they contend, that dispute does not matter for present purposes.  They argue that, if Mills had the rights, Arlen and Sam Arlen terminated the rights in 1979 and the 1980s, respectively.  *See id.* (collecting citations).  And they argue that, if Arko had the rights, it relinquished those rights to Sam Arlen in 1989.  *See id.* 24 (collecting citations).  So, they say, either way the rights eventually came back to them.

The parties' disputes about these eight compositions are complex.  I find that the plaintiffs have failed to show that there are not genuine disputes of material fact about each of the compositions except for one.  I will therefore home in on the dispositive reason for each of them below, though some of the reasons might also apply to other works that were already addressed.  And at the outset, I note that for the plaintiffs' theory of ownership to fail to persuade at summary

---

[17] Specifically, *I've Got the World on a Strong*, *The Devil and the Deep Blue Sea*, *Kickin' the Gong Around*, *Minnie the Moocher's Weddin' Day*, *As Long as I Live*, *Happy as the Day is Long*, *Raisin' the Rent*, and *Stormy Weather*.

judgment, a genuine dispute of material fact need only exist about *either* Arko *or* Mills's ownership because the plaintiffs' theory is that they have the rights no matter which is correct.

First, the plaintiffs have not shown that Arko relinquished the rights to *As Long As I Live*, *Kickin' the Gong Around*, or *Minnie the Moocher's Weddin' Day*. The reason is that the plaintiffs only point to two pieces of evidence of Arko's relinquishment: a 1989 letter stating that it relinquished the rights to three other compositions and a 1998 letter claiming to not control the rights to other compositions. *See* Pl. Reply 25. Neither letter references the three compositions above. *See id.* n.33 (so conceding); Pl. Supp. 2 (agreeing). The plaintiffs reply that Arko has never disputed that the plaintiffs own the works, *see* Pl. Reply 25 n.33, but they have introduced no evidence to meet their initial summary-judgment burden to *show* ownership.

Another three compositions are also subject to genuine disputes of fact. There is a 1977 assignment of the rights to *Happy as the Day is Long*, *Raisin' the Rent*, and *Stormy Weather* from Arlen to Harwin Music Group, which comes before the purported termination the plaintiffs rely on and raises a triable question about who owned them at the time. *See* Pl. Reply 25 (so conceding). The plaintiffs' single-sentence response is that the assignment was not valid because Arlen had already assigned away the rights, *see id.*, but Harlen himself executed this later assignment, so it raises a question of fact about the validity of purported previous one or whether there was a subsequent reversion of rights to him.

On the *Devil and the Deep Blue Sea*, the plaintiffs do not point to any termination sent to Mills, they point to a termination notice sent to a company called Belwin Willis Publishing by Harold Arlen. *See* Dkt. No. 134-2 at 151–53. So there is no evidence that, if Mills had the rights to it, they were terminated.

The plaintiffs have, however, shown ownership of *I've Got the World on a String*. Apple's only objection to the potential Arko chain of title is that the plaintiffs' evidence is a letter stating that Arko did not control the rights to it. Pl. Supp. 2. While that letter is not the legal instrument that relinquished the rights, a jury could conclude based on it that Arko had relinquished the rights and Apple has not shown any contrary evidence. *Cf. Magnuson*, 85 F.3d at 1429. Apple also has not introduced any evidence to call into question the 1931 assignment of renewal rights to Mills,

1    so that potential chain of title is unchallenged too.  *See* Pl. Supp. 3 (arguing about other issues but

2    not showing contrary evidence about the 1931 assignment).

3          Finally, Apple contends that the rights to the last three of Arlen compositions[18] cannot be

4    verified to be owned by the plaintiffs.  The parties agree that Arlen and his co-authors *claim* to

5    have assigned the rights to Players Music Corp. ("Players").  Pl. Oppo. 17; Pl. Reply 27.  They

6    also agree that, eventually, Players assigned the renewal term to a chain that led back to the

7    plaintiffs.  Pl. Oppo. 17; Pl. Reply 27.  But, Apple asserts, there is no evidence of an assignment to

8    Players.  Pl. Oppo. 17.  Then, says Apple, an entity called Crossroads Music Corp. ("Crossroads")

9    purported to assign them to another party who Arlen eventually served a termination notice on.

10         The plaintiffs have introduced a contract showing that Players was once called Crossroads

11   Music Corporation—in other words, that there is any dispute appears to come from the two

12   entities being the same.  *See* Pl. Reply 27; Dkt. No. 111-13 at 40 (contract).  Apple's supplemental

13   brief responds that the plaintiffs needed to introduce the document affecting the name change,

14   rather than a contract that merely reflects it.  Pl. Supp. 5.  But the contract stating that the two are

15   the same is sufficient for a reasonable jury to find in the plaintiffs' favor on that issue; the burden

16   then shifts to Apple to introduce a genuine dispute of fact, which it has not done.[19]

17                          5.  Warren Compositions

18         Apple also argues that there are genuine disputes of material fact about all compositions by

19   Warren.  This dispute will not be resolved now in this forum.  As both parties agree, the ownership

20   of the compositions written by Warren is currently the result of active litigation in California state

21   court.  *See* Pl. Mot. 12; Pl. Oppo. 17.  In brief, two of Warren's granddaughters—one of whom,

22   Riva, is a plaintiff here—are currently disputing whether an assignment by one of them to Four

23   Jays was valid or not.  *See* Pl. Mot. 12.  That suit has progressed past summary judgment.  *Id.*  Its

---

[18] Specifically, *The Eagle and Me*, *Right as the Rain*, and *Evelina*.

[19] Apple also objects that the original term copyright was assigned to an entity called Crawford Music Corp., but there is no dispute that the relevant rights in this dispute are the renewal term rights.  In its supplemental brief, it argues that there is at least a genuine dispute of fact because that assignment may *also* have included the renewal term.  *See* Pl. Supp. 5.  But the evidence of the initial assignment of the renewal term discussed in the body of this Order is sufficient to meet the plaintiffs' initial summary-judgment burden.

existence forecloses a determination on this issue.  The validity of an assignment of copyrights is governed by state law.  *Dolch v. United Cal. Bank*, 702 F.2d 178, 180 (9th Cir. 1983).  If the assignment is ultimately invalidated, it would presumably mean that no rights were transferred to Four Jays, leaving the rights to the songs in the hands of Warren's grandchildren, materially altering the chain-of-title analysis in this case.  The plaintiffs counter that, "at a minimum, Riva's and Hacker's [another grandchild's] assignments to Four Jays cannot be disputed as a matter of law because there is no dispute between Riva, Hacker and Four Jays, the copyrights were assigned."  Pl. Reply 15.  But if the state court finds the transaction invalid, it seems possible that those assignments likewise were invalid if they were part and parcel of one another, even if some these parties do not wish them to be.  Either way, I will not issue an opinion that would interfere with the state court's adjudication.  This issue may be raised again after the state court rules.

The plaintiffs' motion for summary judgment on ownership is GRANTED IN PART and DENIED IN PART as explained above.

### ii.  Validity of Copyrights

The plaintiffs seek summary judgment that the copyrights at issue in this case are valid.  *See* Pl. Mot. 10.  While Apple challenges whether the plaintiffs are the owners of the copyrights, it does raise any dispute of fact that they are valid (whomever owns them).  On this issue, the motion for summary judgment is GRANTED.

### iii.  Embodiment

The plaintiffs move for summary judgment that the recordings embody the Subject Compositions.  *See* Pl. Mot. 13–14.  Apple does not dispute, or address, this issue.  Accordingly, this portion of the motion for summary judgment is GRANTED.

### iv.  Apple Licenses

The plaintiffs move for summary judgment that Apple has no valid licenses to the Subject Compositions; in other words, it seeks to foreclose an affirmative defense that Apple had licenses to the works that it pleaded.  *See* Pl. Mot. 21.  Apple responds that these licenses are "irrelevant" to the issue of infringement because it has not and will not rely on any of them in its defense.  Pl. Oppo. 38–39.  The plaintiffs reply that Apple has, until this brief, maintained it will rely on those

licenses and that so long as they remain part of the pleadings, the issue is live.  *See* Pl. Reply 3–4.

I will not issue an advisory opinion or spend resources analyzing an issue that will not be part of

the case.  Based on its unequivocal representations, on which I now rely, Apple may not raise

these licenses in this litigation to defend itself.

### B. Infringement

The plaintiffs move for summary judgment that Apple infringed their copyrights in four

ways: reproduction, distribution by making the recordings available, distribution through sales,

and importation.  *See* Pl. Mot. 14–20.  Apple responds that summary judgment is unwarranted on

all four theories because there are genuine disputes of fact about whether its behavior satisfies the

"volitional conduct" requirement of copyright law and whether it will prevail on a statute-of-

limitations defense.  Pl. Oppo. 25–38.  Apple also argues that its behavior does not qualify as

importing under the copyright laws and (as discussed) that "making available" theory is not

cognizable.  *Id.*

For today, it is sufficient to find that there are genuine disputes of material fact about

whether Apple satisfies the volitional conduct requirement, so I will not offer gratuitous opinions

on the other matters because they are raised only as defenses to summary judgment, not

affirmative requests for it.

Copyright infringement, as explained, requires showing (among other things) violation of

one of the exclusive rights under the Copyright Act.  The plaintiffs must also demonstrate

causation.  *Fox Broad. Co., Inc. v. Dish Network L.L.C.*, 747 F.3d 1060, 1067 (9th Cir. 2013).  In

the context of direct infringement (as here) causation is "also referred to as 'volitional conduct'."

*Perfect 10*, 847 F.3d at 666.  "Volition," in this context "does not really mean an 'act of willing or

choosing' or an 'act of deciding,' . . . it simply stands for the unremarkable proposition that

proximate causation historically underlines copyright infringement liability no less than other

torts."  *Id.* (internal quotation marks and citations omitted).  Said otherwise, liability "must be

premised on conduct that can reasonably be described as the *direct cause* of the infringement."  *Id.*

(internal alteration and citation omitted).  Proximate causation, the Ninth Circuit has cautioned, "is

an intensely factual question that should typically be resolved by a jury."  *Pac. Shores Properties,*

1    *LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013).

2         As the Ninth Circuit has explained, the volitional conduct requirement means that "direct

3    copyright liability for website owners arises when they are *actively involved* in the infringement."

4    *Zillow*, 918 F.3d at 732.  The court has contrasted this active participation with mere "passive

5    participation."  *Id.*  It adopted the Fourth Circuit's formulation that "there must be actual

6    infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could

7    conclude that the machine owner himself trespassed on the exclusive domain of the copyright

8    owner."  *Id.* (internal quotation marks, alteration, and citation omitted).  But, it has said, some

9    activities "fall on the other side of the line, such as automatic copying, storage, and transmission

10   of copyrighted materials, when instigated by others, do not render an Internet service provider

11   strictly liable for copyright infringement."  *Id.* (internal quotation marks, alterations, and citation

12   omitted).

13        Applying these principles here, summary judgment is denied.  No one disputes that it was

14   the Distributor Defendants that uploaded the allegedly infringing content to the iTunes Store.  That

15   is very nearly the precise situation in *Zillow*.  There, the defendant's real estate website hosted

16   allegedly infringing photos uploaded by others.  Consequently, "to demonstrate volitional conduct,

17   [the plaintiffs] must provide some evidence showing [Apple] exercised control (other than by

18   general operation of [the iTunes Store]); selected any material for upload, download, transmission,

19   or storage; or instigated any copying, storage, or distribution of its [music]."  *Id.* at 732 (internal

20   quotation marks and citation omitted).  The plaintiffs have introduced no evidence that Apple

21   exercises sufficient control or discretion, or that it engaged in instigation, sufficient to entitle them

22   to summary judgment.  Indeed, the plaintiffs' motion did not address the volitional conduct

23   requirement at all.

24         The plaintiffs' Reply argues that Apple's behavior satisfies the requirement because

25   "Apple set up the iTunes store, chose which providers would be permitted to supply content,

26   selected the content it would allow to be sold on iTunes, instigated the copying of the infringing

27   works on its servers, established the entire infrastructure for reproducing and distributing digital

28   copies of music recordings, and profited from every sale."  Pl. Reply 7–8.  What the plaintiffs

United States District Court
Northern District of California

describe is close to the conduct in *Zillow* that the Ninth Circuit found non-volitional as a matter of law.  There too, the defendant required photo providers to use its upload system, adhere to its specifications, load the photos onto its servers, and ran the "entire infrastructure" governing them. *See Zillow*, 918 F.3d 730–34.  And some of the plaintiffs' points are overstated.  Though they characterize Apple as "selecting the content it would allow," there is no evidence that Apple examines the content in any individual way before permitting it to be displayed on the iTunes Store other than requiring that uploaders affirm they have the necessary rights.   Indeed, *the plaintiffs'* evidence shows that what they really mean is that each content provider must just meet Apple's minimal qualifications for starting an account (like owning 20 recordings) and the recordings must be technically compatible with the iTunes Store.  *See* Pl. Reply 9 (summarizing evidence of alleged volitational conduct).  That is similar to what Zillow did.  *See Zillow*, 918 F.3d at 734.

The plaintiffs attempt to distinguish *Zillow* on the ground that "unlike Apple, there is no evidence that Zillow selectively chose who would supply photos displayed on the website.  Zillow did not instigate the copying on its servers through long form contracts by which they required the delivery of all photos owned by its users.  Rather, Zillow acted as a platform where anyone was permitted to upload any image they chose."  Pl. Reply. 10.  Apple, the plaintiffs argue, set prices and had the ability to remove content.  *Id.*  It will be up to a jury to determine whether these actions transformed Apple's behavior into actions "close enough to the infringing event to be considered the most important cause."  *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1081 (9th Cir. 2021).  But I cannot say that these differences swing this case from the summary judgment finding *for* the defendant in *Zillow* into a summary judgement finding *against* Apple.

This analysis applies to all four theories that the plaintiffs move for summary judgment on because the alleged distribution, sales, and importation are also based on the same actions.  The plaintiffs' motion for summary judgment on infringement is DENIED.

## IV.   *DAUBERT* MOTIONS

Apple moves to strike the report and exclude the testimony of three of the plaintiffs' experts.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.  Ty Roberts

Apple moves to strike the report and exclude the testimony of Dale Tyson "Ty" Roberts, whom the plaintiffs proffer as an expert on "Audible Magic," a software that compares audio, and in how Apple uses a similar software, "Gracenote."  *See* Motion to Exclude Expert Report of Ty Roberts ("Roberts Mot.") [Dkt. No. 130].  For the reasons that follow, the motion is GRANTED.

Roberts is a software engineer specializing in audio and music technology.  Report of Dale Tyson Roberts ("Roberts Rep.") [Dkt. No. 115-1] at 2.  He has more than 40 years of experience. *Id.*  He cofounded the company that makes Gracenote, where he was chief technical officer.  *Id.* He holds multiple patents.  *Id.*  He states that Audible Magic was a competitor of Gracenote, so he was aware of its "capabilities."  *Id.*  His report discusses Audible Magic's technology.  *Id.* at 3–6. In brief, it samples audio from one recording and compares it to a database, like fingerprint matching.  *Id.*  He offers a series of opinions about its capabilities, including its accuracy and how one uses it.  *Id.* at 6–7.  He reviewed three "Rx" reports by Audible Magic; a "private database report" by Audible Magic; a video presentation by Steve Jobs about "iTunes Match"; which uses Audible Magic; a video about "iTunes Producer," which uses Gracenote; and an August 2021 email from Audible Magic.  *Id.* at 6.  Those reports examine the recordings in this litigation and match them to songs already on the iTunes Store.  *Id.* at 8–11.  According to Roberts, the results "show thousands of recognitions of the Adasam, Pickwick, and Genepool/Ideal Pirated Recordings produced by Apple within Audible Magic's database."  *Id.* at 11.  Separately, Roberts opines that iTunes Producer uses Gracenote to retrieve "basic metadata" when a song is loaded into iTunes by a consumer.  *Id.*  He opines that this makes it easier for illegitimate content providers to upload unauthorized recordings.  *Id.*  And, according to him, "[a] much more robust system is needed to avoid infringement."  *Id.* at 12.  He gives several solutions.  *Id.*

First, Apple argues that Roberts is not qualified as an expert to opine about Audible Magic. I agree.  The only indication in his report about any specialized knowledge, *see* Fed. R. Evid. 702, of Audible Magic is that Roberts was aware of its capabilities.  Roberts Rep. at 2.  He never elaborates on what that means.  He never indicates, for instance, that he reviewed its internal technical specifications or performed a technical analysis of them.  From the Report, it simply

1   appears that he is aware of Audible Magic's capabilities in the same way any user of it could be.[20]

2   And while he is likely an expert in how Gracenote worked, the report gives no indication that there

3   is reason to think that the technology is sufficiently similar to render him an expert in both, even

4   though they perform the same high-level function.  Indeed, he admitted in his deposition that he

5   was aware of what Audible Magic did "kind of at a high level."  Dkt. No. 111-18 at 105:24–106:1.

6   Despite this lack of specialized knowledge, he opines about Audible Magic's technology's

7   reliability, essentially vouching for it to the jury.  He is not qualified to do so.

8          The plaintiffs respond that "Roberts' conclusions are not about the inner workings of the

9   technology, but rather how audio fingerprinting technology works."  Opposition to the Roberts

10  Mot. ("Roberts Oppo.") [Dkt. No. 142] 7.  But that just begs the question.  There is no reason to

11  think that Audible Magic operates in the same way as Gracenote (or any other software) without

12  an expert analyzing it.  Roberts simply assumes it does, despite his lack of knowledge.  The

13  plaintiffs also argue that "Roberts' role was not to validate the accuracy of the Audible Magic

14  technology," *id.* 7, but that is precisely the opinion he offers.  *See, e.g.*, Roberts Rep. at 12

15  (concluding that the Audible Magic reports are "reliable and accurate" and there is "no doubt"

16  they rendered "reliable and accurate" results).  The plaintiffs contend that Audible Magic's

17  methods are "well-known" and "not a secret," citing several district court cases.  *See* Roberts

18  Oppo. 8 (collecting citations).  That may be so, but it does not mean that Roberts can skirt the

19  rules requiring him to have expert knowledge to render opinions about its inner workings and

20  reliability.  That a software is commonly used to compare samples of music is quite different than

21  an expert opinion about its reliability.[21]

22         Second, Apple argues that Roberts is unqualified to opine about what Apple could or

23  should have done to prevent infringement.  Roberts Mot. 8–11.  Again, I agree.  Roberts was

24  offered as an expert in the technical specifications of the software at issue.  There is no indication

25

26  [20] As noted, Roberts also watched a video presentation about iTunes Match, but there is similarly

27  nothing to indicate that this apparently public video would render someone an expert in the
    technical specifications of the software underlying the program.

28  [21] Because I find Roberts unqualified to opine on this issue, I do not address Apple's alternative
    argument that his findings about it are unreliable.

United States District Court
Northern District of California

his expertise extends to the particular matter of copyright infringement safeguards.  While Roberts *may* have expertise in determining what further *technical* steps Apple can take when it comes to using *Gracenote*, his opinions go far beyond that; he opined, for instance, that Apple should have used a manual review process for certain songs that were flagged and an automated process for flagging in the first place.  *See* Roberts Rep. at 12.  Neither he nor the plaintiffs have attempted to qualify him as an expert in this area.  To resist this, the plaintiffs fall back to his *technical qualifications*—things like patents and his long history in audio recognition systems.  *See* Roberts Oppo. 14–16.  But, as shown, that is not the expertise from which this opinion would need to stem.

## B.  Lisa Alter

Apple moves to strike the report and exclude the testimony of Lisa Alter, who opines that the plaintiffs' chains of title for the Subject Compositions show that they own them.  *See* Apple's Motion to Exclude Expert Reports of Lisa Alter and Robert Kohn ("Alter/Kohn Mot.") [Dkt. No. 131].  For the reasons that follow, the motion is GRANTED.

Alter is an attorney specializing in copyright law.  *See* Report of Lisa A. Alter ("Alter Rep.") [Dkt. No. 131-6] at 3.  She reviewed three chain of title reports prepared by the plaintiffs' counsel that summarized each step in each of their chains of title for the Subject Compositions. *See id.* at 3.  She "assumed that the information contained in each of [those reports] is true and accurate."  *Id.*  She then opines that each report "accurately sets for the chain of title" for the composition.  *Id.* at 4.  Most of the report is an overview of how various aspects of copyright law work.  *See id.* at 4–9.

Apple moves to exclude Alter's opinions as legal conclusions.  "[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court."  *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008). Even when this type of testimony is offered as lay opinion, "the district court could exclude it because the testimony [i]s not helpful to a clear understanding of the testimony or a fact in issue." *Id.* at 1059 (internal quotation marks omitted).

As Alter's extensive discussion of copyright law hints, her opinions are just bald legal

United States District Court
Northern District of California

conclusions.  She opines that, based on information she assumes to be accurate, the plaintiffs have shown that their chains of title would entitle them to ownership *under the copyright laws*.  The correct legal framework is for me to determine and instruct the jury about that.  Whether the parties' evidence shows ownership is for me (at summary judgment) or the jury (at trial) as a factfinder.  None of this is for Alter to say.  *Nationwide*, 523 F.3d at 1058.  Another district court has excluded essentially these same opinions about copyright titles from Alter on this precise ground.  *See Baldwin v. EMI Feist Catalog, Inc.*, 989 F. Supp. 2d 344, 351 (S.D.N.Y. 2013), *rev'd and remanded on other grounds*, 805 F.3d 18 (2d Cir. 2015).

Plaintiffs do not truly dispute this.  Instead, they first argue that it is permissible for me to consider this information at summary judgement even if it were not admissible at trial.  Opposition to the Alter/Kohn Mot. ("Alter/Kohn Oppo.") [Dkt. No. 141] 6–8.  While summary-judgment evidence itself need not be admissible, the party does have to show it is reducible to an admissible form at trial.  *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001).  That is not possible here.  But if the plaintiffs were correct that I can consider it at summary judgment and simply "accord it as much or as little weight as the Court deems appropriate," Alter/Kohn Oppo. 7, I would accord it no weight.  Not only would I accord it no weight for the reasons stated above, but also because Alter's analysis is unhelpful.  In practically one breath, she states that she *assumes* the summary plaintiffs' counsel provided was accurate and independently attests to its accuracy.  All she brings to the case is a truncated history of the copyright laws, a summary of their basic functioning, and the dubious "opinion" that the plaintiffs' evidence shows an unbroken chain of title.

The plaintiffs, recognizing their problem, reply that Alter's conclusions "can easily be rephrased in admissible form."  *Id.* 9.  They give this example:

> "Notice of termination were validly served by Henderson's statutory heirs in accordance with Section 304(c) of the Act with respect to each of the Subject Henderson Compositions" (*Id.*) could be changed to "Notices of termination were served by Henderson's statutory heirs [in a particular manner] with respect to each of the Subject Henderson Compositions."

*Id.* (alteration in brief).

United States District Court
Northern District of California

1    Even assuming Alter can rewrite her report in this way, this type of opinion is not helpful

2    to the jury, as expert opinions must be.  It would simply regurgitate concrete facts understandable

3    to lay people—and do so based on hearsay, without any personal knowledge.  Alter's report

4    admits she is only going off of what counsel reported to her; she cannot pass off the underlying

5    facts as expert opinions.[22]

6        **C.  Robert Kohn**

7    Apple moves to strike portions of the report and exclude some testimony of Robert Kohn,

8    who opines about how Apple's policies and procedures are indicative of willfulness.  For the

9    reasons that follow, the motion is GRANTED IN PART.

10   Kohn founded an online music services provider, authored a book on music licensing that

11   has been quoted by several courts, is a copyright attorney, and has testified about music licensing

12   and related issues in court and other forums.  *See* Report of Bob Kohn ("Kohn Rep.") [Dkt. No.

13   131-4] at 5–9.  He describes his assignment as opining about digital distribution of music, digital

14   music licenses, industry customs and practices, Apple's adhere to industry practice, and Apple's

15   policies related to copyright infringement.  *Id.* at 9.  Relevant here, Kohn opined that "Apple's

16   infringements of Plaintiffs' copyrights is willful."  *Id.* at 38.  He states that it was unreasonable for

17   Apple to rely on the purported licenses it did, it failed to properly vet providers, failed to

18   reasonably respond to takedown notices, and did not employ adequate safeguards.  *Id.* at 38–39.

19   Apple does not object to the entire report, but it does move to exclude Kohn's opinion that

20   its alleged infringement was willful.  Alter/Kohn Mot. 9.  It is proper for an expert to tell the jury

21   about what safeguards Apple did or did not employ, what safeguards other companies do or do not

22   employ, and what safeguards Apple could have employed.  But it is another thing to opine about

23   Apple's mental state.  Indeed, it appears that the plaintiffs accept this.  *See* Alter/Kohn Oppo. at 14

24   (arguing that Kohn should be permitted to opine about his underlying conclusions but not the issue

25

26   _____

27   [22] The plaintiffs repeatedly cite the rule of evidence that "[a]n opinion is not objectionable just
     because it embraces an ultimate issue."  Fed. R. Evid. 704(a).  That misses the point.  Apple does
     not object to, and I do not exclude, these opinions because they embrace any ultimate issue.  I do

28   so because they improperly invade the province of the court and jury and are unhelpful.

1    of willfulness itself).  To the extent Kohn offers his view that Apple's behavior was willful, it will

2    be excluded.  This portion of Kohn's report also offers a lengthy discussion of what constitutes

3    willfulness under the copyright laws; that too will be excluded.  But Kohn is not precluded from

4    opining about industry practices and Apple's practices.

5    **V.      MOTIONS TO SEAL**

6           The parties have filed numerous motions to seal.  Within 30 days, the parties are

7    ORDERED to file a joint renewed motion to seal that includes all of their requests to seal or redact

8    connected to the pending motions.  The redactions in this Order are provisional until I rule on that

9    renewed motion.  All requests must be placed in a table that identifies: (1) the docket entry of the

10   request, (2) the specific redactions requested, (3) the party that is requesting redaction, (4) the

11   general subject matter of the sealing request, and (5) a citation to the declaration providing

12   competent reasons for the request that meet the compelling reasons standard set out in *Ctr. for*

13   *Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016).  The parties must also file

14   or re-file all supporting declarations as exhibits to the renewed motion.  I will not grant requests

15   that are not in the table and supported by competent declaration attached to the motion.

16          It appears that some of the plaintiffs' unredacted versions of documents do not comply

17   with the Local Rule requiring that they "highlight the portions for which sealing is sought."  Civ.

18   L.R. 79-5(e)(2).  The plaintiffs must refile those documents with highlights as exhibits to the

19   renewed joint motion.

20          I do not rule on any of the requests now, but I encourage the parties to move redact or seal

21   as little as possible—my final decision may deny requests in their entirety as overbroad.  In light

22   of that, if the parties no longer wish to maintain any of their requests, the renewed motion must

23   include a list of documents that can be unsealed wholly or partially.

                                              **CONCLUSION**

25          The motions for summary judgment are GRANTED IN PART and DENIED IN PART as

26   explained above.  The *Daubert* motions are GRANTED to the extent indicated above.  The parties

27   shall file a renewed joint motion to seal, as described, within 30 days.

28

United States District Court
Northern District of California

1

**IT IS SO ORDERED.**

2
Dated: March 21, 2022

3

4

_____

5
William H. Orrick
United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California